## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE: XCELERA.COM, INC.
SECURITIES LITIGATION

CIVIL ACTION NO.
00-CV-11649(RWZ)

CLASS ACTION

## DECLARATION OF SCOTT D. HAKALA, PH.D, CFA

### I.    Background and Qualifications of the Expert

1.  I am a director of CBIZ Valuation Group, Inc., a national business valuation and consulting firm that operates as a wholly owned subsidiary of Century Business Services, Inc., a publicly traded business services firm (NASDAQ: CBIZ).  CBIZ Valuation Group, Inc. is one of the largest business valuation and consulting firms in the United States with offices in Dallas, Chicago, Los Angeles, Atlanta and Princeton (New Jersey).  CBIZ Valuation Group, Inc. employs approximately 110 individuals providing business valuation services to public and private companies.

2.  I received a Doctor of Philosophy degree in Economics and a Bachelor's degree in Economics from the University of Minnesota.  I have earned the professional designation of Chartered Financial Analyst, awarded by the Association for Investment Management and Research.  I have taught courses on asset pricing and market efficiency at the doctorate (Ph.D.) level in a Ph.D. granting institution.  In addition, I have served as a consultant and expert witness on numerous occasions regarding economic issues similar

Expert Report and Declaration of Dr. Scott D. Hakala, Ph.D., CFA

to those in this litigation. A detailed summary of my qualifications, including prior testimony and articles, is provided on the curriculum vitae attached hereto as Exhibit A. Plaintiffs are being charged fees for my services in this engagement based on my hourly billing rate of $375 per hour. I have received assistance from other staff employed by CBIZ Valuation Group, Inc., primarily Jeff M. Turk, CFA, Prasun Agarwal, and Kurt Vonderahe.

## II.    Information Considered

3. My opinions are based on my professional experience, as well as a thorough review of a substantial amount of available materials, including:

(a) The In re Xcelera.com, Inc. Securities Litigation Consolidated Amended Class Action Complaint for Violation of the Securities Exchange Act of 1934 ("Complaint");

(b) Securities filings of Xcelera.com and predecessors (collectively "the Company" or "Xcelera") with the Securities and Exchange Commission (SEC) from April 1999 through December 2001;

(c) Plaintiffs' Motion for Class Certification in re Xcelera.com Securities Litigation dated November 12, 2002;

(d) Plaintiffs' Memorandum of Law In Support of Their Motion for Class Certification dated November 12, 2002;

(e) Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification in re Xcelera.com Securities Litigation dated March 7, 2003;

(f) Affidavit of Robin L. Alperstien in support of Defendants' Memorandum of

Law in Opposition to Plaintiffs' Motion for Class Certification dated March 6, 2003;

(g) Affidavit of Dr. Matthew Richardson (Dr. Richardson) dated March 7, 2003;

(h) Published news articles and press releases and other public news from March 2, 1998, through January 7, 2001, found on Factiva, Bloomberg, L.P., and a variety of other news sources including Yahoo;

(i) Various analyst reports gathered from a variety of sources, including Investext;

(j) Option pricing and volume data provided by Optionmetrics;

(k) Institutional trade data provided by Thomson Analytical Research;

(l) Publicly available financial information and public trading price information on Xcelera, market indices and similar public companies as found on Bloomberg. L.P.; and

(m) Various academic texts and published articles as cited in the text.


## III.    Summary of the Analyses and Conclusions

4. I find that the market for Xcelera's common shares is efficient in that the market rapidly reacted to and reflected all public information in the share price during the proposed Class Period. I performed a detailed, integrated event study that found that most of the movements in the stock price of Xcelera over time are explained by a combination of company-specific, industry-specific and market factors (or events). Furthermore, the events can be analyzed in the context of the allegations in the Complaint so as to measure the inflation in the share price in a consistent manner throughout the proposed Class Period. Thus, it is possible to develop a consistent model of damages that

can be used to estimate aggregate damages and to allocate damages across individuals filing proofs of claim.

5. In addressing the factors outlined in *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989), I found strong evidence for the level of market efficiency required for class certification.

(a) There was more than adequate trading volume, public float and market value to attract substantial investor interest and to ensure market efficiency. The trading fundamentals and reasonably high turnover of the public float led to substantial market maker coverage during the proposed Class Period.

(b) The short interest in the stock was also sufficient to demonstrate that the stock was traded efficiently during the proposed Class Period. Dr. Richardson's conclusions regarding restrictions on short selling are conclusory opinions (rather than supported by analysis) and are not born out by the evidence. The amount of short interest changed significantly from month-to-month and the short interest was a significant percentage of the public float and multiple of the daily trading volume.

(c) The fact that Xcelera's shares were listed and actively traded in good standing on the American Stock Exchange (AMEX) market is, by itself, usually sufficient to conclude that the market for its shares is reasonably efficient. The existence of a developed options market during portions of the Class Period is further evidence of market efficiency. Dr. Richardson's assertions that the prices in the options market somehow violated arbitrage assumptions is analytically flawed and fails to recognize the trading costs appropriate for analyzing Xcelera. Had Dr.

Richardson analyzed put option, call option, share price, and interest rate information that occurred at the exact same time, he would have found that deviations from put-call parity were much smaller than is concluded in his report and put-call parity is largely upheld.

(d) Xcelera's securities filings were in good order and consistent with an efficiently traded security.

(e) Finally, my event study analysis demonstrated a clear cause and effect relationship with respect to the relevant disclosures during and after the proposed Class Period.

6. I reviewed in detail the expert report by Dr. Richardson. His report largely side-steps or ignores the more traditional factors considered in assessing market efficiency for class certification purposes in favor of methods and analyses that are conclusory and flawed. Dr. Richardson's focus on volatility as a measure of market efficiency is not acceptable or useful as a measure of inefficiency and is not consistent with the proper statistical test for excess volatility. The proper excess volatility test finds that the market is reasonably efficient (little or no autocorrelation). Dr. Richardson's "event" study analysis was not adequately integrated with a study of the market and industry indices specific to Xcelera and was extremely primitive by current academic standards. As a result, the effects of certain identified events were improperly estimated. Furthermore, there was a failure to properly identify and characterize the informational events, or news, on certain dates.

7. Dr. Richardson's report does not provide objective tests of market efficiency appropriate for class action securities analysis. As I understand it, the standard for

market efficiency required for "fraud-on-the-market" reliance merely implies that the market incorporates (impounds) new information in the stock price in a reasonable period of time such that market participants can assume that the stock price reflects the mix of information publicly available (and the heterogeneous views of the market participants). The fact that Xcelera was a young company in an industry that is perceived to be rapidly growing and subject to substantial increases in future prospects means that the stock price will be more volatile than average and that investors' views will be more heterogeneous. This greater than average volatility does not prove that the market was inefficient. Indeed, greater volatility may be evidence that the market was more efficient as the market rapidly adjusts to new information. By focusing on volatility as a measure of market efficiency, Dr. Richardson demonstrates a lack of understanding of the proper measures of market efficiency and a concept of market efficiency. His analysis confuses market efficiency with a level of hyper-rationality or perfect foresight on the part of market participants that is unrealistic and not required for a presumption of fraud-on-the-market. Thus, his analysis amounts to second-guessing the market, concluding that the market, in retrospect, appears to have over-valued Xcelera at least during part of the proposed Class Period.

8. In conclusion, Xcelera's shares were widely followed and monitored by investors and participants in the market responding quickly to public information regarding the Xcelera. My event study demonstrates that public information was impounded in a manner consistent with market efficiency as required for the fraud-on-the-market presumption and that an analysis of damages common to the proposed class over the proposed Class Period is reasonable and appropriate. Dr. Richardson's report never

really addresses the level of market efficiency required for class certification and reliance under the fraud-on-the market presumption: Does the market for Xcelera's common shares incorporate the public information within a reasonable period of time?   Dr. Richardson apparently cannot deny that the market for Xcelera's shares reacted rapidly to new information, but seems to be suggesting that the market was inefficient because it overvalued Xcelera in retrospect during part of the proposed Class Period and because the stock price of Xcelera was volatile.   These arguments are irrelevant in terms of determining market efficiency under *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989).

IV.     **Summary of the Analyses**

       *Market Efficiency Tests*

9. Market efficiency for the purposes of this declaration and report means that all relevant and publicly available information is impounded in share prices.   This definition is often referred to as a version of the semi-strong form of market efficiency.   When the securities market is efficient, the price of the security is the consensus price of all market participants at any given point in time.

10. In assessing market efficiency for class certification, it is my understanding that the market needs to be sufficiently efficient that the class of shareholders that purchased shares during the proposed Class Period were affected in a common manner by the same information that was allegedly materially misleading or materially omitted during the proposed Class Period.   In that sense, an event study and other analysis should reveal the amount of the inflation impounded in the stock price such that it can be presumed that the entire class was affected by the alleged material misstatements and material omissions in

a common and consistent manner and, furthermore, damages to the class and to the individual class members can be measured using a single, internally consistent model of damages.

11. In *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989), at 1285, the Court listed five factors for determining whether a market for a security is efficient:

    (a) The trading volume of the security;

    (b) The coverage by security analysts;

    (c) The existence of market makers;

    (d) Eligibility to file SEC Form S-3 or traded on a national stock exchange;[1] and

    (e) A causal relationship between unexpected corporate events or financial releases and an immediate response in the security's price.

12. Based on my own experience in analyzing in detail the movements of the stock prices of hundreds of individual companies over the past ten years, it is my opinion that equity securities traded on regulated public exchanges and with a minimum number of market makers are almost always subject to reasonably efficient markets for the purposes of estimating and evaluating stock price movements in response to changes in expectations arising from public disclosures. This does not mean that the market is always right in retrospect in pricing a given security or group of equity securities.[2] It merely means that the market efficiently priced those securities at any given time and the

---

[1] See *Cammer v. Bloom*, 711 F. Supp, (D.N.J. 1989), at 1264, 1276-1277. "[S]ome may concur with [Defendant's] suggestion-which was doubtless unintended-that companies listed on national stock exchanges or companies entitled to issue new securities using SEC Form S-3 would almost by definition involve stock trading in an 'open and developed' market."

[2] Providing supposed examples of alleged market inefficiency by resorting to retrospective information is easy to do. But showing that one can prospectively exploit public information on a given security or group of securities to realize unusually high expected returns has rarely, if never, been proven in practice. A similar argument was made by Mark Rubinstein in "Rational Markets: Yes or No? The Affirmative Case," *Financial Analysts Journal,* Vol. 57, No. 3, May/June 2001, pp. 15-29.

ability to exploit public information to realize exceptional returns from active investing over time is extremely limited or largely non-existent.  Similarly, Brealy & Myers, in their widely read and accepted academic text, *Principles of Corporate Finance*, Sixth Edition, 2000 (p. 368), state, "we believe that there is now widespread agreement that capital markets function sufficiently well that opportunities for easy profits are rare."

13. In order for a market for a given equity security to be inefficient, it must be shown that there is some fundamental defect or limitation in the market for that security that prevents information from being quickly incorporated into the stock price.  As will be shown in the following paragraphs, applying the five *Cammer* factors in this instance suggests that we must presume that the market for the shares of Xcelera is highly efficient.

14. First, the trading volume and public float of Xcelera shares provides strong evidence of a widely followed stock with many traders.  The public float of Xcelera was 27,252,968 split-adjusted shares as of January 31, 2000, and 27,511,120 split-adjusted shares as of July 14, 2000, with an average share price of $21.10 during the proposed Class Period.  The ordinary rule of thumb is that the underwriters would prefer an initial public offering of at least two million shares and an initial public float of at least $20 million after the initial public offering in order to attract sufficient market maker and investor interest to allow for an active market for the security.  Beyond that number of shares and market value in the public float, my experience has been (and it is generally accepted by underwriters) that the market for a given equity security is reasonably efficient.  In this case, the public float both in terms of the number of shares available to

be traded and in market value was well beyond the level desired to maintain market efficiency.

15. The average daily trading volume during the proposed Class Period was 1,096,042 split adjusted shares per day (in excess of 4.0% of the total number of shares available to trade at the end of the proposed Class Period).  A base trading volume of 1,722,286 shares on average per day in April 1999 was reported.  This represented a reported trading volume greater than 6.3% of the outstanding shares available to trade as of January 2000.  This is relatively high trading volume given the public float at the time and reflects an actively traded and widely followed security.  In my experience in studying trading dynamics in various valuation assignments, an equity security with positive trading volume on nearly every trade day and with a base of daily trading volume in excess of 5,000 shares on days with no news usually attracts sufficient investors, market makers and interest to be efficiently traded.  Sufficient numbers of investors and market makers are considering buying or selling, even at that relatively low volume, to allow the market to react efficiently to information.

16. Additionally, the trading volume increased substantially in response to relevant news events.  For example, when the Company announced it was entering the Internet sector through the purchase of a majority interest in Mirror Image Internet on April 1, 1999, the trading volume increased to 4,591,200 shares as investors reacted to the announcement.  Other news events created strong trading volume as well.  For example, the December 21, 1999 announcement that Hewlett Packard planned to take a $32 million stake in Xcelera resulted in daily trading volume of 3,440,000 shares on that day.  This is strong evidence that the market was reacting efficiently to public information.

17. Similarly, there was sufficient trading volume and a sufficient public float to allow for short sale transactions. A short sale transaction allows an investor to borrow shares and to sell them (without ever having purchased shares in the first place). A short sale must eventually be "covered" by purchasing sufficient shares to negate or offset the short sale. Short sales help to ensure an efficient market by allowing investors to efficiently bet against the Company or to hedge their existing shareholdings. If investors sense or believe that a company's shares are over-valued, they can sell those shares short and will adjust the share price downward. The short interest (number of shares sold short) is reported in the middle of each month. The short interest during the proposed Class Period began at 858,360 shares (2.70% of the float according to Dr. Richardson) in April 1999, was as low as 246,332 shares in August 1999, rose to a high of 4,429,192 shares (13.93% of the float according to Dr. Richardson) in January 2000 and ended with 2,519,354 shares (7.19% of the float according to Dr. Richardson) in August 2000. The short interest was sufficient for active trading and to ensure market efficiency. The short interest increased and decreased substantially over time. At the same time, the level of short interest during the proposed Class Period was not excessive in amount relative to the trading volume and public float.

18. Additionally, a market for options in Xcelera developed during the proposed Class Period. An options market does not develop unless there is a level of trading and investor interest well beyond the levels required for market efficiency.

19. The first *Cammer* factor (trading volume), combined with the presence of adequate short selling activity and short selling opportunities, is sufficient evidence to

conclude that the market for the Company's stock was efficient during the proposed Class Period.

20. The second *Cammer* factor (analyst coverage) is also important in finding an efficient market for Xcelera's shares. Xcelera was covered by possibly the most influential analyst in the Internet and new technology sector, George Gilder, publisher of the Gilder Technology Report, during the proposed Class Period. Independent analysts and reporters also published opinions regarding the Company on Investmenthouse.com, Bulltrade.com, Daytradingintl.com, Splittrader.com, and Smartmoney.com. The latter magazine published several critical stories on Xcelera during the proposed Class Period that were widely followed by investors. Additionally, the Company was indirectly covered by a number of sources, including Morgan Stanley Dean Witter, Commerce Capital Markets, Advanced Equities, SG Cowen, CIBC World Markets, KBRO Kaufman Bros., Credit Lyonnais Securities, and Bear Stearns. In addition to direct and indirect analyst coverage, Company representatives were interviewed on various television programs about the prospects for their company during the proposed Class Period, including a September 3, 1999 interview on CNNfn. In my experience, the combination of limited analyst coverage, regular company press releases, regular securities filings and periodic conference calls is sufficient to allow investors to stay informed of company events and allows for a reasonably efficient market. The presence of George Gilder and other active analysts covering Xcelera throughout the proposed Class Period suggests more than enough analyst coverage to attract and retain institutional shareholder interest and is a reflection of an active, efficient market for Xcelera's common shares.

21. The third *Cammer* factor (market maker activity) similarly suggests an efficient market for Xcelera's shares during the proposed Class Period. Market makers are brokerages and banks that maintain firm bid and ask prices for securities, and will buy and sell individual securities at publicly available prices. The presence of market makers helps ensure market liquidity. Xcelera was actively traded on a public exchange and had sufficient volume for specialist (market maker) coverage. In fact, by the quarter in which the proposed Class Period ended, over twenty market makers were active in the Company's stock, with seven market makers trading over one million shares each in the quarter.

22. The fourth *Cammer* factor considers the ability of the Company to register shares or to qualify to have its shares traded on a national stock exchange. Overall, Xcelera was in good standing as a public company and its continued listing on the AMEX was secure during the proposed Class Period. Thus, Xcelera should be viewed as having an efficient market for its stock given the principles underlying this *Cammer* factor.

### *Event Studies and Market Efficiency*

23. The fifth *Cammer* factor relates to the market's reaction to news concerning the Company in a causal manner. Some of the most important news events related to the allegations in the Complaint, such as the announcement regarding the purchase of a majority interest in Mirror Image Internet on April 1, 1999, the disclosure of a $32 million investment in Xcelera by Hewlett Packard on December 21, 1999, as well as relevant disclosure events, such as the negative coverage by Lazard Freres on July 13, 2000, and the November 29, 2000, disclosure regarding potential dilution of Xcelera securities. The April 1, 1999, event led to a relative increase in the stock price of

194.76% on that day. The December 21, 1999, announcement led to a relative increase of 21.04% in the stock price on that day. The July 13, 2000, analyst report led to a relative decline of 19.78% in the stock price on that day. The November 29, 2000, 20-F disclosure led to a relative decline of 14.12% in the stock price on that day.

24. Other events during or around the proposed Class Period also illustrate that the price of Xcelera's shares moved rapidly and significantly in reaction to information that altered the market's perception of the value of the stock. For example, the paid advertisement identified as an interview on "Wall Street Interviews" on April 9, 1999 led to a relative stock price increase of 27.05%.

25. I have found that stock price movements are very complex and relate to a variety of information from news over time. Investors are heterogeneous and subtle changes in news can lead to significant stock price changes. Often investors generate a substantial amount of information prior to, during and after earnings announcements. This information enters into the market and affects the stock price in the days before, on the day of and on the days after the earnings announcements and events.[3] Nevertheless, Exhibit B demonstrates that most of the variance in Xcelera's stock price can be explained by a combination of industry and market indices and by company-specific news.

26. I have found that retrospective reviews of analysts' reports, news reports and press releases will only partially explain the company-specific stock price movements on

---

[3] See, for example, Eakins, Stansell, Teer and Wertheim, "Earnings forecasts and institutional demand for common stock," *Journal of Applied Business Research,* January 1997, p. 57+, (discusses the effect of whispers on earnings expectations relative to analyst earnings expectation numbers); and, Campbell, Lo and Mackinlay, *The Econometrics of Financial Markets,* 1997, p. 166, ("The CAR plots show that to some extent the market gradually learns about the forthcoming [earnings] announcement. The average CAR of the good-news firms gradually drifts up in days –20 to –1, and the average CAR of the bad-news firms gradually drifts down over this period.")

any given day. However, if I was able to call the significant market makers for a given stock on a given day, I might realize that the stock price moved due to information that was not captured in my retrospective news search. Rather than being evidence of market inefficiency or irrationality, this suggests that the market for a given equity security is highly efficient and quickly and efficiently reflects information learned by a subset of market participants. It also means that the stock price may efficiently react to information on a given day but the event study may not have identified the event.

27. Similarly, high volatility and changes in stock prices over time are usually not evidence of market inefficiency, especially for determining class damages in securities litigation. High volatility may simply mean that subtle and possibly contradictory information is entering into the market over time.[4] One day, an earnings release may cause a significant positive increase in the stock price. The next day a reassessment by an analyst or publication of an interview or conference call may temper that response and cause an offsetting negative reaction in the stock price due to changes in future expectations.

28. Event studies attempt to jointly estimate the effects of industry and market indices and statistically significant events on movements in a specific company's stock price over a period of time. By analyzing specific company returns against market and industry norms over a given period of time, the market reaction and statistical

---

[4] Mark Rubinstein in "Rational Markets: Yes or No? The Affirmative Case," *Financial Analysts Journal,* Vol. 57, No. 3, May/June 2001, p. 23. "Excess Volatility. Believers in this anomaly assert that asset prices vary far too much relative to fundamentals. Even if true, this observation, which was popularized by Shiller (1981), has a good explanation that is consistent with rational markets: Much of the volatility in prices derives from changes in the beliefs about the demand curves of other investors, a form of endogenous uncertainty. ...Even in a rational market, investors may be quite uncertain and at times mistaken about the views and positions of other investors. They are not mistaken on average, of course, but frequently turn out after the fact to have been optimistic or pessimistic. In practice, the current price, past price changes, and volume provide only a noisy signal about future investor intentions."

significance of significant news events can be ascertained. I have included an event study and associated statistical analysis, which is summarized in Exhibit B. In my experience, for a Class Period of the length proposed and given the stock price movements observed, explaining even weekly movement in Xcelera's stock price movements demonstrates sufficient market efficiency for reliably estimating class damages and allocating class damages to individual class members. But, in this case, we can clearly explain most of the stock price variance on a daily, and two-day basis with reasonable reliability.

29. The peer companies selected for my analysis are composed of eight publicly traded companies identified in a search through analyst reports and public information on the competitors and customers of Xcelera, as well as general knowledge regarding the technology sector. I compiled the daily returns for these eight peer companies into a geometrically constructed stock index, which is labeled Subindx1 on Exhibit B. Subindx1 is composed of Inktomi Corp, CT Holdings Inc., CMGI, Inc., Safeguard Scientifics, Inc., America Online, Earthlink, Inc., Yahoo! Inc., and Intasys Corporation, which trade under the ticker symbols INKT, CITN, CMGI, SFE, AOL, ELNK, YHOO, and INTA, respectively. These companies are primarily composed of complementary companies and shared common stock price movements with Xcelera. In addition, I found that the NASDAQ composite index (CCMP in Exhibit B) provided information useful in predicting the movements in Xcelera's stock price.

30. Exhibit B (page one) demonstrates that 14.67% of the daily stock price variance, 17.49% of the two trade day stock price variance, 21.66% of the three day stock price variance, and 28.59% of the weekly (five-trade day) stock price variance are explained

solely by peer group indices and market indices. The level of explanation of the variance reported in Exhibit B (the R-squared) for each regression is in line with other studies I have performed and strongly indicates market efficiency. The fact that the movements of Xcelera's common share price is significantly (statistically significant at the 99.9% level of confidence) correlated with the movements of companies that are its peers or are in complementary lines of business means that Xcelera's stock price is reacting efficiently to information in the industry and in the general stock market. Thus, Xcelera's common stock is efficiently reacting to public information.

31. The statistical methodology in Exhibit B uses daily observations of returns but aggregates them over varying windows of time. Thus, the regressions consider returns over single trade days to returns over two, three, and five (weekly) trade days.[5] This methodology introduces a moving average (smoothing) process (that is easily corrected for statistically) and demonstrates that the fundamental industry and market movements are increasingly important over time and that the market is reasonably efficient for estimating class damages over a number of months.

32. The estimated effects of the events provided on page two of Exhibit B are based on using dummy variables in stock price regressions with varying windows of time. This methodology is increasingly recognized as necessary to jointly estimate the effects of industry and market indices and events on movements in a specific company's stock price.[6]

---

[5] The stock price series are adjusted into cumulative return indices (incorporating dividends and stock splits in the returns on a daily basis). The cumulative return indices are then transformed using the natural log transformation and differencing the natural log transformed series over the selected window in terms of trade days.

[6] Section 5 of Binder, "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting*, 11, (1998), pp. 111-137, discusses the use of dummy variables in a regression to capture the effects of multiple events. Some econometricians in the 1990's have advocated this technique as preferred

33. The statistical analyses summarized in Exhibit B are revealing. Most of the variation in the stock price of Xcelera throughout the study period is explained by a combination of identified company-specific events, industry/peer group events and general market trends. The percentage of the variance (R-squared) in Xcelera's stock price explained in these regressions increases from 67.45% between trade days, to 69.63% across two trade days, to 73.76% across three trade days, to 80.14% across five trade days (weekly). These percentages are as good as or better than I typically have found in similar event studies for other securities. As one focuses on longer event windows and observation windows, an increasing percentage of the variation in Xcelera's stock price movements is explained by the combination of identified company-specific events, peer group indices and market indices. This strongly indicates that the market for this stock is efficient.

34. Furthermore, I find that the statistical properties of Xcelera's stock price movements from one day to the next are such that there is little correlation between the movements in the stock price from one day to the next and over periods of time. This is viewed as strong evidence of rapid and efficient reactions to news events and evidence of market efficiency. It is also strong evidence that the volatility in the stock price of Xcelera does not suggest market inefficiency.[7]

35. The most important "surprise" events identified in Exhibit B have statistically significant effects in my analysis. In my analysis, I sought to identify all or nearly all of the news and information in the form of published articles, press releases, reports, news

---

and so as to avoid an omitted variables problem in the regression analysis.

[7] One of the tests for market inefficiency is to show that unexplained stock movements in one period of time can be used to predict movements in subsequent periods. When unexplained stock price movements are not highly correlated and relatively uncorrelated over time, this generally leads to the conclusion that the market for the stock is reasonably efficient.

bulletins and financial filings of Xcelera from February 1, 1999, through December 29, 2000 (approximately four months after the proposed Class Period). When all of the news is properly considered and evaluated, the identified company-specific news consistently causes an immediate stock price reaction consistent with the unexpected component of the news. When the news is not new or is consistent with prior expectations (such as secondary announcements about acquisitions or new investments) only a modest stock price reaction, if any, was observed.[8] Thus, the event study regressions strongly suggest that the market for Xcelera's common stock was efficient. The stock market quickly integrated information into the stock price of Xcelera and reflected the market's consensus beliefs and expectations with respect to Xcelera.

36. Exhibit B demonstrates the substantial, immediate reaction to news during the proposed Class Period, adjusting for the market and industry indices. On February 17, 2000, bullish statements by George Gilder led to relative share price increase of 43.23%. Negative coverage by Lazard Freres on July 13, 2000 led to a 19.78% relative decrease in the share price on that day.

37. The event study results in Exhibit B can be readily applied in a daily inflation per share analysis for determining both the individual and aggregate damages realized by the eligible shareholders that purchased shares during the proposed Class Period. There is nothing unusual in nature in this event study and stock price analysis that would prevent class-wide damages from being estimated based on these identified events to Xcelera's

---

[8] This is consistent with *Nathenson v. Zonagen, Inc.,* 2001 U.S. App. LEXI 20902 (5th Circuit, Sept. 25, 2001) at *13, "public statements falsely stating information which is important to the value of a company's stock traded on an efficient market may affect the price of the stock even though the stock's market price does not soon thereafter change." For example, if the market believes the company will earn $1.00 per share and this belief is reflected in the share price, then the share price may well not change when the company reports that it has indeed earned $1.00 a share even though the report is false in that the company has actually lost money (presumably when that loss is disclosed the share price will fall).

share price (taking into consideration the allegations in the Complaint and any facts subsequently discovered).

## V.    Discussion of the Richardson Affidavit/Expert Report

### *Defining Market Efficiency*

38.  I have read and considered the Richardson Affidavit dated March 7, 2003.  The report begins with a failure to properly define the level of market efficiency required for class certification and confounds this problem with an implicit definition of market efficiency that is inconsistent with the academic literature.  Dr. Richardson confuses or improperly attempts to confuse the reader by associating market efficiency with market rationality (Richardson Affidavit, paragraph 9).   Furthermore, the entire analysis presumes that Dr. Richardson can properly discern or measure "rationality."  However, he cannot measure irrationality and there is no accepted test of irrationality.

39. There are three general levels of market efficiency:   weak, semi-strong, and strong.  Weak efficiency merely means that the general characteristics of stock trading are such that one cannot reasonably predict future stock price movements by examining the historical trade data.   Semi-strong efficiency incorporates weak efficiency and assumes that the market impounds (incorporates) public information in the price of the stock.  There are subtle differences in definitions of semi-strong efficiency.  For this purpose, semi-strong efficiency is defined as market incorporation of the mix of public information in the stock price in a reasonable period of time.  Strong efficiency assumes semi-strong efficiency and that the market is able to incorporate private, as well as public information, in the stock price.  Efficiency does not imply rationality in the context

asserted by Dr. Richardson. Market efficiency does not imply that the stock price must always conform to some idealized fundamental value that is demonstrated in retrospect. It merely means that the mix of information is such that the heterogeneous views of the various market participants are reflected in the stock price and that the market reconciles those heterogeneous views. Thus, even in Dr. Richardson's "behavioral finance" world, markets are usually efficient. Dr. Richardson's idea that the systematic biases in the beliefs and trading of individual investors leads to market inefficiency is not consistent with the definition of market efficiency.

### *General Efficiency of Internet Stocks*

40. Consistent with this improper definition of market efficiency, Dr. Richardson's report largely concludes that the market for Internet-related securities was both irrational and inefficient. (Richardson Affidavit page 4, paragraph 14)  This is an interesting theoretical argument bolstered in retrospect by the subsequent collapse of prices for Internet-related securities, but does not support the theory that the market knew or could know for sure that such securities were overvalued during the proposed Class Period. After all, if one was reasonably certain that a particular security was overvalued, presumably one could short the stock and/or engage in options trading to exploit this fundamental conclusion. It also ignores the ability to use hedging strategies to buy one stock or index and sell short another stock if one believed that one company was overvalued relative to its peers, industry or an appropriate index. Thus, Dr. Richardson's limits to arbitrage and irrational pricing theory rests on the assumption that all companies within the same peer group of Xcelera were similarly and consistently overvalued.

41. Dr. Richardson's argument rests on the conclusion that the value of Xcelera deviated from its fundamental value (Richardson Affidavit, page 6, paragraph 16). The problem with this argument is that as an emerging growth stock, Xcelera's fundamental value is difficult to ascertain and subject to wide variation. Since most of the companies in the Internet sector had negative earnings (Richardson Affidavit, page 6, paragraph 18), performing a fundamental valuation is not easy and it would be expected that various reasonable investors might have widely varying beliefs about the value of such companies. If Dr. Richardson is right, he is arguing that the analysts recommending the stock were wrong and the investors buying the stock were wrong. Since most of the public float did not turnover on a given day or week in the absence of substantial news, the longer term buyers should have sold their shares long before the end of the proposed Class Period. Being wrong does not prove or establish a lack of market efficiency. If one was reasonably certain that the market was wrong, then one could have easily taken actions to exploit that fact.

42. To attempt to fence off the ability to exploit misspricing, Dr. Richardson (Richardson Affidavit, pages 7-9) argues incorrectly that there are limits to arbitrage. Dr. Richardson's argument that high volatility acts as a disincentive to short selling is largely theoretical and frankly wrong. I have experience evaluating short sellers and short selling (including as a day trading strategy) in the relevant time period. First, the argument assumes that the traders of Xcelera stock are relatively undiversified investors. Individual traders can and do limit their exposure to short positions and can and do cover their short positions and roll them over. Second, it assumes the existence of successful short squeezes (increases in the stock price such that shorts are forced to buy shares to

cover their positions). Short squeezes are not very common and usually unsuccessful or backfire as strategies. Usually, the reason short sellers cover their positions and cease shorting a stock in a rising stock price environment is because it does not make sense to short against a rising sentiment for a stock driven by buyer interest overcoming selling interest. This is an efficient market mechanism, not an inefficient market mechanism. When the short interest declines in a rising market, it means that the majority of the followers of the stock are bullish and believe the stock to be trending upward for sustainable reasons. A relatively small position of one's wealth can be committed to short selling a single stock so as to limit the risk of short squeezes asserted by Dr. Richardson. Hedging strategies obtained by buying a basket of similar stocks to protect against a general run-up and temporary loss on a short position and option-trading strategies can be employed to limit losses and ensure against extreme events and undiversifiable risk. Here, the public float and short interest was such that the ability to sell short Xcelera on upticks was clearly present on every day during the proposed Class Period and there were plenty of upticks allowing for short selling. The short position was able to increase at various points throughout the proposed Class Period.

43. Similar fallacies exist in Dr. Richardson's reference to event studies. For example, he asserts (incorrectly) that a name change should not be a significant event (Richardson Affidavit, page 10, paragraph 27). In fact, the company announced that its name change better reflected its holdings and intention to expand in the Internet sector, which investors viewed positively. To assert that an increase in stock price resulting from a change in strategy is irrational is wrong. The same argument relates to the spin off theory. Some times companies are worth more as spin offs and the market's ability to

focus on value can change with the spin off of an entity. Since stock prices are options, the spin off can free the parent of the expenses and losses of the subsidiary during its development and growth stages and limit the downside risk to the parent. In addition, the announcement of the Company's name change to Xcelera.com was accompanied by other positive news, including a two for one stock split and the company's agreement to use Inktomi Corp.'s software in its Internet services. In fact, Alexander Vik attributed much of the day's jump to this latter announcement. Dr. Richardson's retrospective second-guessing about market rationality (was the stock correctly valued?) sidesteps and ignores the issue of the market's efficiency (did the stock adjust rapidly to new information?) during the proposed Class Period.

### *Efficiency of Xcelera Stock*

44. Dr. Richardson continues his fundamental errors in improperly defining market efficiency and misapplying the tests of market efficiency to Xcelera. (Richardson Affidavit, pages 11-23)

45. Much of the discussion amounts to second guessing the market's reaction to certain events and making assertions regarding market inefficiency that are unproven or unprovable. The assertion that the run-up in the stock price of Xcelera and its subsequent decline was a speculative bubble is merely an assertion. (Richardson Affidavit, page 13, paragraph 33). Most of the increase and decline in Xcelera's stock price is related to company-specific events and industry price movements. This does not establish that the market was inefficient.

46. In paragraph 35 (page 13) of the Richardson Affidavit, Dr. Richardson makes a clearly incorrect statement that "Xcelera's stock was difficult to short." I would consider

a short position that ranges from .77% of the float to 13.93% of the float and ranging from .6 times to 3.14 times the average daily volume in various months during the proposed Class Period as evidence of a healthy ability to short Xcelera's stock price. It provides no evidence for Dr. Richardson's unsupported assertion that Xcelera's stock was difficult to short during the proposed Class Period.

47. Similarly, Dr. Richardson misapplied the put-call parity analysis in Exhibit 4 and referred to in paragraph 35(a)(iii) of the Richardson Affidavit (pages 14-15). I have obtained the same information underlying the Richardson Affidavit exhibits. First, put-call parity deviations can only be properly measured by examining simultaneous quotes and trades on the options market and for the stock on the exchange. The timing of the closing trades and price quotes often does not provide such information. Thus, some of the deviation from put-call parity asserted in Exhibit 4 and paragraph 35 is an artifact of the method of calculation and timing of trades throughout each day and not a true violation of put-call parity. Second, the round-trip trading costs (including the bid-ask spreads and trading commissions for the underlying stock and trading commissions on the options and Treasury securities) are such that the median 'deviation" from put-call parity is not reasonably exploitable. Given the daily volatility of Xcelera's shares, the amount of the alleged deviation as a percentage of the stock price is not statistically significant, or inconsistent with measurement errors commonly observed in analyses such as those provided in Exhibit 4 of the Richardson Affidavit.

48. Dr. Richardson's argument on page 16 of the Richardson Affidavit that greater than average turnover is evidence of market inefficiency is similarly fallacious. An actively traded stock with substantial float and greater volatility will tend to have greater

turnover of shares. In fact, the greater daily turnover of the shares in the public float is evidence of market efficiency, not the reverse. It means that the stock is being actively monitored and traded regularly by investors. Furthermore, contrary to Dr. Richardson's assertion, the greater share turnover has no measurable effect on the ability to short shares. The turnover of Xcelera's shares is largely driven by the number and significance of company-specific events. That fact would strongly indicate that the market is efficient in the manner required for class certification, not the reverse.

49. Dr. Richardson's arguments regarding limitations on short selling on pages 16 and 17 are not credible. Noting that the short interest declined after the stock price of Xcelera rose in February 2000 does not provide much credence for the assertion that short selling was restricted. The short interest increased substantially after the stock price increased in January 2000. The short selling activity indicates that company-specific news that caused the price of the stock to increase in February 2000 also caused short selling to decline in both absolute and relative terms. If this inhibited short selling, short selling would not have increased again in the subsequent months or in prior months. In fact, short selling increased substantially from 806,342 shares in mid-March 2000 to 1,912,966 shares in mid-May 2000. Short selling increased again to 2,519,354 shares in August 2000 even though Xcelera's share price increased from July 2000 to August 2000. Thus, Dr. Richardson's theory on the restriction on short selling is inconsistent with the level of short selling throughout the proposed Class Period.

50. Dr. Richardson's analysis (Richardson Affidavit, pages 17 and 21 and Exhibits 6 and Exhibit 11) implies that comparing the volatility of Xcelera's shares with the volatility of other companies and certain market indices is somehow evidence of market

inefficiency.   The first problem is that the Dr. Richardson's measure of volatility incorporates the large changes in Xcelera's stock price resulting from company-specific news.   The volatility statistics are biased by these large changes (non-normality and kurtosis), which throw off the test-statistics and bias the test results.   Second, volatility is not a measure of market "inefficiency."   It is a measure of changing expectations and the degree of uncertainty as to the value of a given stock.   Campbell, Lo and Mackinley in The Econometrics of Financial Markets (1997) criticize the notion that volatility is evidence of market inefficiency.   They state (p. 23), "Many people seem to think that an efficient security price should be smooth rather than random.   [Fischer] Black (1971) has attacked this idea rather effectively: 'A perfect market for a stock is one in which there are no profits to be made by people who have no special information about the company, and in which it is difficult even for people who do have special information to make profits, because the price adjusts so rapidly as the information becomes available.... Thus we would like to see randomness in the prices of successive transactions, rather than great continuity...Large price movements are desirable, so long as they are not consistently followed by price movements in the opposite direction.'"   Nearly every single public company has greater stock price volatility than the NASDAQ Composite index and the Standard & Poor 500 index for obvious mathematical reasons.[9]   Furthermore, stock prices tend to be more volatile for technology stocks and when significant changes in expectations are common (such as during periods when a lot of disclosure events occur).   Thus, Dr. Richardson's volatility comparisons in Exhibit 6 and Exhibit 11

---

[9] Because these broad market indices represent an averaging of the movements of many different publicly traded stocks, the average will nearly always be less volatile than the stock price of any given public company.

explain nothing new and do not represent evidence of market inefficiency at all.[10] Indeed, such volatility in response to company-specific news and continual reevaluation of the value of the company is evidence of market efficiency of the type sought for a fraud-on-the-market presumption.

51. Dr. Richardson continues his argument by noting that the average bid-ask spread for Xcelera was larger than for other companies that were much larger in market capitalization. A bid-ask spread of 1.38% for a company of Xcelera's size and relative volatility during the proposed Class Period is actually quite modest. Companies with greater volatility and less capitalization will tend to have greater bid-ask spreads. Since the bid-ask spread is a fraction of the average daily volatility, it is considered relatively modest and not of concern.

52. Similarly, comparing analyst coverage on larger market capitalization stocks with Xcelera does not answer the question as to whether the market for Xcelera was efficient. There was analyst coverage during the proposed Class Period and the stock had active trading on an exchange.

53. References to block size in Exhibit 10 of the Richardson Affidavit are both misleading and improper. First, by focusing on the average trade size of each trade, the percentage figures substantially understate that percentage of shares traded in blocks greater than or equal to 1,000 shares. Second, one would expect greater block trading in stocks with larger average market capitalization. Comparing block trades of Dow Jones Industrial Average companies with Xcelera is both misleading and meaningless since Dow Jones companies are held in such large positions by institutions as to necessitate a

---

[10]Campbell, Lo and Mackinlay, *The Econometrics of Financial Markets*, 1997, p. 24, criticize the attempt to "test" for market efficiency.

lot of block trading.  The fact that 9.9% of all trades were in blocks of 1,000 shares or more is evidence of substantial investor interest and investors taking sizable positions in the stock.    It is also not so substantially different from the median for the MOX index of 13.2% of all trades involving blocks equal to or greater than 1,000 shares as to indicate a relative lack of interest in Xcelera's shares and a lack of market efficiency for Xcelera.

54.  Dr. Richardson's reference to Xcelera's fundamental valuation (Richardson Affidavit, pages 20-21, paragraphs 41-43) is entirely flawed.  First, his analysis largely ignores the fact that Xcelera was primarily a holding company that held equity investments in other Internet-related companies and that many of those companies were in the nature of venture capital investments.  The references to Xcelera's revenues and earnings make no sense in that context.  Second, his entire analysis ignores the fact that Hewlett-Packard, a sophisticated institutional investor, held shares of Xcelera during the proposed Class Period and chose to hold those shares.    Similarly, over 30 other institutional investors invested in Xcelera in the period between March 2000 and August 2000.

55.  The final analysis of Dr. Richardson is an extremely primitive and biased "event study" in paragraph 44 (pages 21-23).  By failing to account for company-specific events in the analysis of standard errors and failing to consider standard errors during a "clean period," Dr. Richardson's event analysis i) violated the assumption of normally distributed returns (non-normally distributed returns due to kurtosis or fat-tails), ii) substantially overstated the standard errors associated with returns during the proposed Class Period, and iii) biased downward the event t-statistics (test of statistical

significance).[11]   Given the company-specific events, stock price trends and changes during the proposed Class Period, it is entirely inappropriate to compare the daily percentage change in Xcelera's stock price with an average or median change in Xcelera's stock price.   The proposed market index does very little to explain the movement of Xcelera's stock price over time.   Estimating the relationship between Xcelera and the MOX index over a six-month period from August 10, 2000, to February 10, 2001, is inappropriate as it improperly assumes that no company-specific events occurred during that period of time and that the study period was a "clean period."

56. In Exhibit B, I provide a more rigorous and consistent event study for Xcelera using dummy variables to capture the effects of each identified event.[12]   The integrated

---

[11] There is substantial general and specific literature in the statistics, economics and finance fields discussing the problems that arise in the traditional two-pass CAR methodology.  See, for example, Larcker, Gordon and Pinchea, "Testing for Market Efficiency:  A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267-287.  The authors in this paper state (p. 267), "The objective of this paper is to suggest that the traditional CAR methodology is often inappropriate and that *intervention analysis* [italics in original] is a possible alternative.  Where the systematic risk (i.e. Beta) of a firm change as the result (or in anticipation) of an announcement, the cumulative average residual methodology will result in biased residuals. ...Intervention analysis, on the other hand, can separate such risk changes from the information content of the announcement.  In addition, intervention analysis also allows the observed auto-correlation in the market model residuals to be removed, thus providing improved beta estimates required for reliable statistical testing."  Some of the finance articles on event studies have not recognized these problems (possibly due to the remedial nature of such articles, the authors lack of recent training in time-series econometrics or the authors lack of familiarity of more recently developed statistical procedures).  First, the "clean period" required to obtain estimates the standard errors and the coefficients of the market model in the CAR methodology is almost never really clean in a statistical sense.  Clean in a statistical sense implies few or no significant company-specific events and a properly specified market model.  Because company-specific events are common in stock price return data, the residuals during the candidate "clean period" are usually not close to normally distributed (fat tails or kurtosis is common) and the estimated market model is biased and inconsistent due to an *omitted variables problem*.  These problems lead to overstated standard errors and understated t-statistics during the event analysis stage of the two-pass methodology.  Additionally, changes over time can render the market model coefficients in the "clean period" inapplicable to or biased relevant to the estimation period.  Second, the market model in the two-pass CAR methodology is often estimated using a daily returns series.  The low percentage of variance explained by the market model (low R-squared of 15% or less) leads to an unfavorable (low) signal to noise ratio and will tend to cause the market model coefficients to be understated or inaccurate even if the omitted variables (omitted company-specific) events did not cause them to be biased.  For this reason, beta estimates are preferably made using longer return windows until the R-squared improves or the estimation of the market model must be made in a regression with the company-specific events included as (indicator or dummy variables).

[12] Many academic articles discuss the use of dummy/indicator variables to capture the effects of events including:  Larcker, Gordon and Pinchea, "Testing for Market Efficiency:  A Comparison of the

---

(dummy variable) multivariate regression (MVRM) method employed in this study is vastly superior to the method employed by Dr. Richardson in that it requires that the events be explained within the statistical analysis and estimates the regression and standard errors in the context of the identified events during the study period.[13]

57. In this case, my analysis (as was previously discussed in that context of Exhibit B) demonstrates that the events of interest have the expected direction effects on Xcelera's stock price and are statistically significant.  Dr. Richardson's argument (Richardson Affidavit, pages 21-23, paragraph 44) regarding certain identified events is simply that the observed effects were greater than he believes should have been observed. In essence, he is quibbling with and second-guessing the market's reactions.  This does

---

Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267-287; Binder, "Measuring the Effects of Regulation with Stock Price Data," *The RAND Journal of Economics*, Summer 1985, pp. 167-183; Karafiath, "Using Dummy Variables in the Event Methodology," *The Financial Review*, August 1988, pp. 351-358; Malatesta, "Measuring Abnormal Performance: The Event Parameter Approach Using Joint Generalized Least Squares," *Journal of Financial and Quantitative Analysis*, March 1986, pp. 27-38; and Dufour, "Dummy Variables and Predictive Tests for Structural Change," *Economics Letters*, 6, 1980, pp. 241-247.  Examples of sections in textbooks discussing using dummy indicator variables to capture events in time include: Pindyck & Rubinfeld, *Econometric Models & Economic Forecasts*, 1991, pp. 104-108; Spanos, *Statistical Foundations of Econometric Modeling*, 1986, pp. 536-539 (and as part of a continuing example of modeling money holding behavior in a dynamic, time-series regression); Enders, *Applied Econometric Time Series*, 1995, pp. 243-249 (discusses structural change in unit root time-series and uses dummy variables to test for and adjust for structural change or level shifts in such series); and Intriligator, Econometric Models, Techniques, and Applications, 1978, pp. 58-61, and Campbell, Lo and Mackinley, *The Econometrics of Financial Markets*, 1997, p. 167.

[13] See the references and discussion in the two prior footnotes.  Examples of the academic literature on procedures for identifying outliers (shocks or events) in time series and adjusting for those events through the use of dummy variables or alternative means are found in:  de Jong and Penzer, "Diagnosing Shocks in Time Series," *Journal of the American Statistical Association*, Vol. 93, June 1, 1998; Atkinson, Koopman and Shephard, "Detecting Shocks: Outliers and Breaks in Time Series," *Journal of Econometrics*, 1997, pp. 387-422; Balke, "Detecting Level Shifts in Time Series," *Journal of Business and Economic Statistics*, 11, 1993, pp. 81-92; LeFrancois, "Detecting Over-Influential Observations in Time Series," *Biometrika*, 78, 1991, pp. 91-99; Pena, "Influential Observations in Time Series," *Journal of Business and Economic Statistics*, 8, 1990, pp. 235-241; Tsay, "Time Series Model Specification in the Presence of Outliers," *Journal of the American Statistical Association*, 81, 1986, pp. 132-141; Tsay, "Outliers, Level Shifts and Variance Changes in Time Series," *Journal of Forecasting*, 7, 1988, pp. 1-20; Box and Tiao, "Intervention Analysis with Applications to Economic and Environmental Problems," *Journal of the American Statistical Association*, March 1975, pp. 70-79.

not signal a lack of market efficiency. I simply disagree with many of Dr. Richardson's assertions.

(a) An announcement of a planned name change or name change is and can be news if it signals a shift in focus. Dr. Richardson ignores the content of the April 26, 1999, and October 14, 1999, announcements.

(b) An investment by Hewlett-Packard announced on December 21, 1999, and another announcement on April 5, 2000, was a signal of confidence in the Company and the Company's value to the market. It should increase the value of Xcelera. It is well known that private placements of funds in public companies can signal value to outside investors and cause increases in the price of the publicly traded shares. The same can be seen in the investment in Mirror Image by Exodus on March 22, 2000.

(c) Analyst reports and statements can cause significant increases or decreases in a company's stock price, depending on the content and strength of the statements. Thus, not surprising or inconsistent with efficient markets that positive analyst statements made by George Gilder on February 17, 2000, resulted in a relative increase of 43.23% on a one-day basis and 62.61% on a two day basis, or that negative announcements made by Lazard Freres on July 17, 2000 resulted in a relative decline of 19.78% on a one-day basis and 14.70% on a two day basis.

(d) The expectation on June 1, 2000, that one of the Company's investments was planning on raising funds through an initial public offering is both an indication that the companies Xcelera was investing in were making progress and that

Xcelera would have the expected ability to realize proceeds from the sale of its equity position in the future.

### *Conclusion*

58. I found Dr. Richardson's willingness to second guess the market to be an inappropriate test of market efficiency in the context of class certification. The issue, as I understand it, is whether Xcelera's shares were widely traded and adequately followed such that the market reacted in a timely and reasonable manner to changes in public information and public expectations regarding Xcelera. Dr. Richardson redefines market efficiency to imply a strong form of market efficiency well beyond the definition required for reliance and the fraud-on-the-market presumption.

59. Dr. Richardson's reliance on volatility, bid-ask spreads and other tests as a measure of market inefficiency is not widely accepted and lacks sound theoretical support. The test for exploitable volatility (significant negative autocorrelation) demonstrates that the volatility is not inefficient and does not provide for excess profits.

60. Finally, Dr. Richardson does not accurately address the factors listed in *Cammer vs. Bloom* for considering market efficiency.

61. I may perform additional analyses and to review additional discovery. I, therefore, may amend and supplement my conclusions based on subsequent analyses and discovery.

I declare under penalty of perjury under the laws of the United States of America and the State of Massachusetts that the foregoing is true and correct.


Executed this 27th day of March, 2003, at Dallas, Texas.


Scott D. Hakala, Ph.D., CFA

# Exhibit A
## Scott D. Hakala, Ph.D., CFA

## Employment History

- **1992 – Jan 1998, March 1998 to Present   CBIZ Valuation Group, Inc. (formerly Business Valuation Services), Dallas, Texas**

  *Director/Principal.*  As a financial economist and financial analyst, Dr. Hakala brings to the firm extensive practical knowledge of finance, economics and statistics.  His expertise includes: corporate finance, restructuring and cost of capital; the valuation of securities and business interests (transactions, mergers, acquisitions, fairness opinions); the valuation of intangible assets (patents, trademarks); analysis of publicly traded securities (insider trading studies, trading analyses, event analyses, materiality, damages in securities litigation); economic loss analyses (commercial litigation); wage and compensation determination (reasonable compensation studies, lost personal income, wrongful termination); transfer pricing; derivative securities (options pricing and valuation); and antitrust and industry structure, strategic pricing, marketing and cost allocation analyses.

- **Jan 1998 – March 1998   Laser BioTherapy, Inc., Dallas, Texas**

  *Interim President.*  Dr. Hakala served as the Chief Executive Officer of Laser BioTherapy, Inc. His decision-making authority involving issues of marketing, employment, negotiating with investors, pricing, product planning, financial planning and all other corporate decisions.

- **1988 - 1992   Dept. of Economics, Southern Methodist University, Dallas, Texas**

  *Assistant Professor.*  Dr. Hakala taught graduate and undergraduate courses in macroeconomics, monetary/financial economics, financial institution regulation and international financial management. He supervised dissertations on international money, commodity options and forward markets, and foreign exchange rates.  His research interests included monetary policy, the causes of fluctuations in employment and output, capital stock estimation, aggregate production theory, foreign currency movements (futures, options and forward contracts), inflation, interest rate movements and the term structure of interest rates, asset pricing and consumption.

- **1983 - 1988   Dept. of Economics, University of Minnesota, Minneapolis, Minnesota**

  *Lecturer.*  Dr. Hakala designed course materials and taught large classes in macroeconomics and international economics.  He served on hiring committees and evaluated other instructors.

  *Debate and Speech Coach for Eight Years.*  Dr. Hakala recruited and trained high school students and maintained budgets.  He produced two State Debate Champions, qualified teams for the National Debate Tournament and produced a top-ten, nationally ranked debate team.

## Formal Education

- Doctor of Philosophy, Economics - 1989
  University of Minnesota, Minneapolis, Minnesota
  Graduate School Fellowship

- Bachelor of Arts, Economics - 1983
  Minor in Business Administration and Pre-Law Emphasis
  University of Minnesota, Duluth, Minnesota
  Graduated Summa Cum Laude
  Whiteside Scholarship, full tuition and expenses

## Honors and Awards

- Distinguished Instructor, Department of Economics, University of Minnesota, 1987-1988

- Earhart Foundation Award, 1985

- Graduate School Fellowship, 1983 and 1984

- Cecil H. Meyers Outstanding Economics Student Award, 1982

- Perfect Scores on Quantitative Analysis and Verbal Analysis sections of Graduate Record Examination (GRE), 1982

- Alice Touhy Tweed Award, High School Valedictorian, 1979

- Lee Krough Award (outstanding character), American Legion's Minnesota Boy's State, 1978, elected Lt. Governor and invited to represent state at other events

- Centrum Award, 1979 (for outstanding character and contributions)

## Professional Associations

- CFA Charter, The Institute of Chartered Financial Analysts, completed all tests and requirements for a CFA designation

- Member, Association for Investment Management & Research (AIMR)

## Publications

- "Estimating and Applying Economic Value Added," Chapter 13E - *Financial Valuation: Businesses and Business Interests - 1998 Update.* Publisher: Warren, Gorham & Lamont

- "Valuation for Smaller Capitalization Companies" (with Dr. Mukesh Bajaj), Chapter 12A - *Financial Valuation: Businesses and Business Interests - 1998 Update.* Publisher: Warren, Gorham & Lamont.

- "Analysis and Valuation of Distressed Equity Securities" (with Mr. M. Travis Keath), Chapter 13F - *Financial Valuation: Businesses and Business Interests - 1999 Update.* Publisher: Warren, Gorham & Lamont.

- "Analysis and Valuation of Distressed Equity Securities" (with Mr. M. Travis Keath), *Valuation Strategies,* September/October 1999, pp. 24-34. Publisher: Warren, Gorham & Lamont.

- Contributing author in *The Art of M&A Integration: A Guide to Merging Resources, Processes and Responsibilities*. October 1997. Publisher: McGraw-Hill. Contributed on valuation of tangible and intangible assets (patents, trade secrets, customers, goodwill, employment agreements, non-competes, etc.), allocation of purchase price issues, accounting treatment of acquisitions, international valuation and transfer pricing and general valuation and due diligence issues. Assisted editor in commenting on and editing first half of text.

- Provided live and taped interviews pertaining to economic issues for television, including lengthy interviews for CNN (July 1990), WFAA-TV (July 1990; July 1991; March 1992), and radio (Internet radio on November 9, 1999, discussing Microsoft anti-trust issues).

## Lectures Presented

Dr. Hakala is a frequent public speaker on valuation, economics, ethics, and monetary policy. Examples include:

- "Valuation of Options for Litigation Purposes" – New York University CLE Presentation-October 2000

- "Valuation Issues-Family Limited Partnerships" – Professional Financial Service, LP's Family Limited Partnership Alert and Update; Dallas/Fort Worth - February 2000

- "PPOs for Sale: the Valuation of Managed Care Entities" - Caesars Palace; Las Vegas, Nevada - September 1992

- "Equilibria in Continuous-Time Models of Money" - refereed paper presented to the Sixth World Congress of the Econometric Society; Barcelona, Spain - August 1990

- "The Use and Holding of Currency" - Feature Presentation - Western Economic Association Meeting; San Diego, California - July 1990

- "Values and Economics" - Dallas Philosophical Forum; Dallas, Texas - March 1990

- "Ethics and the Role of Government" - ARCO Oil and Gas Research Center; Plano, Texas - October 1989

- "Continuous-Time Models of Money: Policy Implications" - paper presented to the Division of Research and Statistics of the Board of Governors of the Federal Reserve; Washington, DC - January 1988

## Expert Witness/Litigation Support

Dr. Hakala has undertaken various assignments involving litigation support and has testified as an expert witness. He has been qualified as an expert and has testified in both U.S. District Court and in U.S. Tax Court. The following is a list of testimony on record:

- *Teleplus, Inc., v. Avantel, S.A.;* United States District Court, Western District of Texas, San Antonio Division (Civil No. SA-98-CA-0849 FB); deposition testimony March 26, 2003; testified as to the valuation of a reseller and marketer of long-distance telephone services (primarily for domestic and international service in Mexico).

- *Donald P. Williams vs. Peter O. Holliday, III, MD, and Open MRI of Decatur;* Circuit Court of Morgan County, Alabama (Case Number: CV-00-974); testified at trial March 4, 2003; testified as to the value of loan guarantees and the value of a business operating an MRI in a shareholder oppression lawsuit.

- *Menard, Inc. v. Commissioner of Internal Revenue;* U.S. Tax Court; testified in trial February 27, 2003; testified as to the compensation of executives in comparable and guideline companies and the proper valuation of incentive compensation benefits.

- *Richard Strauss, Sovereign Texas Homes, ltd., et al. vs. Wallace Sanders & Company, et al.;* 191st Judicial District, Dallas County, Texas (Cause No. 02-2562-J); deposition testimony February 14 and 20, 2003; testified as to materiality, causation, and damages as a result of allegations of improper accounting.

- *In re VISIONAMERICA, INC. SECURITIES LITIGATION;* United States District Court, Middle District of Tennessee, Nashville Division (Master File No. 3-00-0279); deposition testimony December 12, 2002; testified as to materiality, causation, inflation per share and damages as a result of allegations of securities fraud involving accounting misstatements (violations of the Securities Exchange Act of 1934, Rule 10b-5).

- *In re National Golf Properties, Inc. Shareholder Litigation; (Masseo Investment Partners, Ltd., Anne Marie Rouleau, Thomas Feiman, IRA and Robert Lewis, On Behalf of Themselves and All Others Similarly Situated, vs. James M. Stanich, et al.;* Superior Court of the State of California, County of Los Angeles (Lead Case No. BC268215); deposition testimony November 22, 2002; testified as to fairness and problems with a fairness opinion involving a proposed acquisition of the public REIT, including process, disclosure and allocations of proceeds problems.

- *Ralph R. Unstead, Jr., On behalf of Himself and All Other Similarly Situated, v. Intelect Communications, Inc., et al.;* U.S. District Court for the Northern District of Texas, Dallas Division (No. 3:99-CV-2604-M); deposition testimony October 31, 2002; testified as to materiality, causation and damages in a class action securities case.

- *Physicians Resource Group, Inc. and EyeCorp, Inc., vs. Dr. David Meyer, et al.;* U.S. Bankruptcy Court, Northern District of Texas, Dallas Division; deposition testimony October 22, 2002; trial testimony February 7, 2002; testified as to issues of solvency and reasonably equivalent damages as a result of certain transactions between the defendants and the plaintiffs prior to bankruptcy.

- *Maximicer, L.L.C., vs. PepsiCo, Inc.;* U.S. District Court for the Eastern District of Texas, Marshall Division (No. 2-01-CV-132(tjw)); deposition testimony October 21, 2002; trial testimony December 10, 2002; testified as to damages arising from claims of commercial defamation and other causes.

- *HALCYON INVESTMENTS INC., f/k/a B.A.S.S.,Inc., et al.. vs B.A.S.S., LLC, f/k/a LIVEWELL ACQUISITION,LLC, B.A.S.S. (IP)., et al.;* AAA Arbitration (File No. 30 E 181 00434 02); deposition testimony October 10, 2002; testified as to due diligence, disclosures and economic damages estimates involving an agreement to sell a business between the parties (subject to confidentiality agreement).

- *Jerry Krim, et al. v. pcOrder.com, Inc., et al.;* U.S. District Court for the Western District of Texas, Austin Division (Master File No. A:00-CA-776-SS); hearing testimony September 20, 2002; testified in a class certification hearing on the trading of shares and source of shares purchased by proposed lead plaintiffs.

- *APA EXCELSIOR III L.P., APA EXCELSIOR III OFFSHORE, L.P.,APA/FOSTIN PENNSYLVANIA VENTURE CAPITAL FUND, CIN VENTURE NOMINEES LIMITED, STUART A. EPSTEIN and DAVID EPSTEIN, v. PREMIERE TECHNOLOGIES, INC.,BOLAND T. JONES, PATRICK G.JONES, GEORGE W. BAKER, SR., and RAYMOND H. PIRTLE, JR;* U.S. District Court for the Northern District of Georgia (Civil Action No. 1:99-CV-1377-JOF); deposition testimony September 4, 2002; testified as to the materiality of certain representations and damages in a securities case.

- *Microtune, L.P. v. Broadcom Corporation;* U.S. District Court for the Eastern District of Texas, Sherman Division (Civil Action No. 4:01-CV-023); deposition testimony August 29, 2002; testified as to the reasonable royalty in a patent infringement case.

- *John F. Havens, On Behalf of Himself and All Others Similarly Situated, vs. James L. Pate, et al.; and Howard Lasker, On Behalf of Himself and All Others Similarly Situated, vs. James L. Pate, et al.,* 295th Judicial District, Harris County, Texas (Cause No. 2002-16085); deposition testimony July 15, 2002; hearing testimony July 18, 2002; testified as to the materiality of certain information omitted from a proxy to Pennzoil-Quaker State shareholders, issues with respect to the fairness opinion analysis by Pennzoil's financial advisor, the determination of fairness and issues with respect to mergers and acquisitions.

- *Lawrence D. Poliner, M.D. v. Texas Health Systems, et al.;* U.S. District Court, Northern District of Texas, Dallas Division (Civil Action No. 3:00CV1007-P); deposition testimony May 20, 2002; testified as to certain anti-competitive issues involving a specialist medical practice.

- *In re: Chartwell Health Care, Inc.; John H. Litzler, Chapter 7 Trustee, vs. Irving D. Boyes, et al.;* U.S. Bankruptcy Court, Northern District of Texas, Dallas Division (Case No. 398-38546-SAF-7); deposition testimony April 25, 2002; testified as to solvency and economic losses of a nursing home operator.

- *Leonard Sauls, Jr. v. The Estate of William Lee Hatch, Jr., Deceased, et al.;* In the Probate Court Number One, Travis County, Texas (Cause No. 75278-A); deposition testimony March 22, 2002; testified as to the measurement of lost future earning capacity, case settled before issuance of deposition transcript.

- *Leland Stenovich, et al., vs. Spencer F. Eccles, et al.;* Third Judicial District Court, Salt Lake County, State of Utah (Class Action, Case No. 000907870); deposition testimony February 5 and 6, 2002; testified as to standards of practice, fairness and adequacy of consideration in a class action lawsuit relating to the acquisition of First Security Corporation by Wells Fargo.

- *In re Computer Associates Class Action Securities Litigation;* U.S. District Court for the Eastern District of New York (Master File No. 98-CV-4839); deposition testimony January 23 and 24, 2002; testified as to materiality, causation and damages in a securities fraud lawsuit.

- *Pamela Graham Reeves vs. VIJ, Inc. d/b/a National Utilities Co./NUCO and Greer Industries, Inc.;* U.S. District Court for the Northern District of Texas-Fort Worth Division (Case No. 400=CV-1671-BE); trial testimony January 9, 2002; testified as to market wages, current job market and likelihood of employment for an individual alleged to have been wrongfully terminated.

- *Patricia E. Vincent and James R. Vincent v. Bank of America Texas, N.A.;* In the 68th Judicial District Court, Dallas County, Texas (Cause No. DV99-00745); testimony in hearing in December 2000 and trial testimony December 18, 2001; testified as to the proper calculation of interest on a home mortgage and common standards and practices for calculating mortgage interest.

- *Joan C. Howard and Charles A. Anderson, on behalf of themselves and all others similarly situated. v. Everex Systems, Inc., and Steven L.W. Hui, et al..;* U.S. District Court for the Northern District of California (Case No. C 92 3742 CAL); deposition testimony November 19 and 20 and December 17, 2001; testified as to materiality, causation and damages in a securities fraud lawsuit.

- *Reinsurance International Services Company, L.L.C. v. Lambert Fenchurch Group Limited, et al.;* In the 98th Judicial District Court, Travis County Texas   (Civil Action No. 99-00745); deposition testimony September 20, 2001; testified as to lost profits and lost business value experienced by a reinsurance broker relating to allegations of misrepresentations and breach of duty.

- *Robert Alpert, James Ventures, L.P., Markus Investments, Inc. and James Investments, Inc. vs. Innovative Valve Technologies, Inc., et al.;* U.S. District Court for the Southern District of Texas, Houston Division (Civil Action No. H-01-076); deposition testimony September 19, 2001; testified as to materiality, causation and damages in a securities fraud lawsuit.

- *Premier Lifestyles International Corporation vs. Electronic Clearing House, Inc.; XpresscheX, Inc., et al.;* Superior Court for the State of California, County of Los Angeles (Case No. BC230691); deposition testimony September 17 and 27, 2001; trial testimony November 27 and 28, 2001; testified as to lost business opportunities and damages arising from various causes of action.

- *In re Phycor Corporation Securities Litigation;* U.S. District Court for the Middle District of Tennessee, Nashville Division (Civil Action No. 3-98-0834); deposition testimony August 9 and November 6, 2001; testified as to materiality, causation and damages in a securities class action lawsuit.

- *Ben Higbee and Bridgestone Healthcare Management, Inc. .vs. Bridgestone Healthcare Management, Inc.,...and David E. Sones;* 101st Judicial District, Dallas County, Texas (Cause No. 00-7365-3); deposition testimony June 21, 2001; testified as to preliminary findings as to fairness of certain transactions involving a workers' compensation and rehabilitation business.

- *Auto Wax Co., Inc. v. Mark V Products, Inc...;* U.S. District Court for the Northern District of Texas, Dallas Division (Civil Action No. 3-99 CV 0982-T); deposition testimony April 25, 2001; trial testimony June 29, 2001; testified as to the reasonable royalty and lost profits in a patent infringement and trademark infringement case.

- *Robert K. Bell, et al. v. Fore Systems, Inc., et al..;* U.S. District Court for the Western District of Pennsylvania, (Civil Action No. 97-1265); deposition testimony February 1, 2 and 14, 2001, as to the materiality of various alleged accounting misrepresentations and as to damages in a class action shareholder lawsuit.

- *Scott Cunningham and Elizabeth Cunningham v. Gutierrez, Mitchell & Colmenero, L.L.P., et al.;* 201st Judicial District, Travis County, Texas (Cause No. GN0-00849); deposition testimony January 12, 2001; trial testimony March 7, 2001; testified as to the economic loss and value to the owners of a temporary services business.

- *Damron Auto Parts, Inc. v. Commissioner of Internal Revenue;* U.S. Tax Court (Docket No. 5661-00); testified in trial January 9, 2001; testified as to the maximum compensation payable to an officer of a company primarily engaged in auto salvage operations.

- *John Armstrong and Dan Armstrong vs. American Home Shield Corp.;* U.S. District Court for the Northern District of Texas, Fort Worth Division (Civil Action No. 4:99-CV-169-Y); deposition testimony December 18, 2000; testified as calculations of incentives relating to an acquisition and subsequent employment agreements.

- *Frank Roger., on Behalf of Himself and All Others Similarly Situated, vs. Sunrise Medical, Inc., et al.;* Superior Court of the State of California, County of San Diego (Case No. GIC 756421); testified in deposition November 30, 2000; testified as to the professional standards; adequacy and reasonableness of analyses and due diligence associated with fairness opinions, materiality of certain omissions and allegedly misleading statements associated with securities filings and a tender offer; and appropriate measures of fairness in a private leveraged buyout with management participation.

- *Donald A. Barnett, et al., vs. Glenborough Pension Investors, et al. and William Paden, et al., vs. Glenborough Pension Investors, et al.;* Superior Court of the State of California, County of San Mateo (Case No. 392541); testified in deposition November 16 and 17, 2000; testified as to the reasonable basis and appropriateness of a fairness opinion issued by a financial advisor; the materiality of representations by the defendants and the appropriate measures of damages suffered by the class of limited partners as a result of such statements and representations; and as a result of alleged breaches of fiduciary duty.

- *EPI Environmental Products, Inc., v. In-Line Plastics, L.C., et al.;* U.S. District Court for the Southern District of Texas, Houston Division (Civil Action No. H-98-4209); deposition testimony October 10, 2000;

testified as to the reasonable royalty and lost profits resulting from a theft of trade secrets and patent infringement claims.

- *William Eric Graham, et al., on Behalf of Themselves and All Others Similarly Situated, vs. Taylor Capital Group, Inc. f/k/a Cole Taylor Financial Group, Inc., et al.;* U.S. District Court for the Northern District of Illinois, Eastern Division (Civil Action No. 98-C-0779); deposition testimony September 25 and 26, 2000, as to the materiality of various representations and damages in a class action shareholder lawsuit; deposition testimony December 11, 2000, on the standards of practice for fairness opinions and appropriateness relating to two fairness opinions.

- *Alice Kucera, Individually and as Next Friend of Sherry Quaid and Bobby Quaid vs. Kevin W. Niblett,M.D., and Southwest Vascular and Surgical Group, P.A. ;* 134th Judicial District Court, Dallas County, Texas (Cause No. 97-09671); deposition testimony July 25, 2000; testified as to the economic loss and present value of a life care plan for an individual resulting from a vaccination.

- *In re: Southern Mineral Corporation, SMC Production Company, Amerac Energy Corporation, BEC Energy, Inc., SMC Ecuador, Inc;* United States Bankruptcy Court, Southern District of Texas, Victoria Division (Case No. 99-60358-V2-11); testified in deposition on June 28, 2000; testified as to valuation of reserves and enterprise value of a company engaged primarily in the exploration and production of oil and gas reserves.

- *Dave Henderson, Individually, And on behalf of David W. Henderson; David W. Henderson, Individually vs. Connaught Laboratories Inc. d/b/a Pasteur Merieux Connaught, Rhone-Poulenc Group, and TMC Medical-Longivew, Ltd. d/b/a Taylor Medical Center;* 124th Judicial District Court, Gregg County, Texas (Cause No. 98-1735-B); deposition testimony May 15, 2000; testified as to the economic loss and present value of a life care plan for an individual resulting from a vaccination.

- *W. Perry Copus, Jr. and Belinda Copus, vs. STB Systems, Inc.;* 44th Judicial District Court, Dallas County, Texas (Cause No. 98-06234); deposition testimony April 14, 2000; testified as to the materiality of certain representations and the valuation and determination of measures of economic loss under claims by the plaintiff and counterclaims by the defendant relating to the acquisition of and subsequent performance of a business acquired by the defendant.

- *Brewers Quality Homes, Inc. vs. Commissioner of Internal Revenue Service;* U.S. Tax Court (Docket No. 8222-99); deposition testimony April 13, 2000; trial testimony June 14 and 15, 2000; testified as to the reasonable compensation of a manufactured home dealer.

- *IMT, Inc. vs. Haynes & Boone, L.L.P., Jeffrey Becker and Timothy Powers;* County Court at Law No. 2, Dallas County, Texas (Cause No. CC-98-10075-b); deposition testimony April 11, 2000; testified as to the value of a license agreement associated with an anti-radiation device for computer monitors.

- *Robert Thibodeau, et al., v. Great American Life Underwriters, Inc. et al.;* 101st District Court, Dallas County, Texas (Cause No. 96-13246); deposition testimony April 7, 2000; testified as to the materiality of certain representations and the valuation and determination of measures of economic loss involving the loss of rights to insurance commissions and ownership in a set of life insurance policies.

- *Maxwell Romotsky, On Behalf of Himself and All Others Similarly Situated, vs. Cameron Ashley Building Products, Inc., et al.;* County Court at Law No. 1, Dallas County, Texas (No. 00-00971-A); testified in hearing and qualified as an expert on certain issues relating to mergers and acquisitions on February 24, 2000; testimony as to the customary practices and fair bidding processes in proposed a buyout of a company.

- *Norman Yourish, Kenneth Yourish, Bruce L. Daley and Tony W. Kim, On Behalf of Themselves and All Others Similarly Situated, vs. California Amplifier, Inc., Ira Coron, David Nichols, Michael Ferron, Arthur Hausman and William McKenna;* Superior Court of the State of California, County of Ventura (Lead

Case No. CIV173569, consolidated with CIV173981); testified in deposition February 10, 2000; testified as to the materiality of public statements and representations by the defendants and the appropriate measure of damages suffered by the class of shareholders as a result of such statements and representations.

- *John Trickett vs. A.G. Edwards & Sons, Inc. and Lanier Lafitte*; U.S. District Court for the Northern District of Texas, Dallas Division (Civil Action No. 3-98CV2912-T); deposition testimony January 18, 2000; trial testimony August 2000; testified as to the valuation effect of a premature exercise of employee stock options.

- *Robert Stovall v. WRS Group, Ltd, et al., Jary M. Ganske and Shirley Ganske, Intervenors*; U.S. District Court for the Western District of Texas, Waco Division (Civil Action No. W-99-CA-239); deposition testimony December 17, 1999; testified as to the standards of professional appraisal practice, including acceptable and unacceptable appraisal practices and assumptions, requirements that appraisers address and consider relevant information in an appraisal report and ethical requirements for disclosure of relationships and conflicts by business appraisers.

- *Payless Housing, Inc. D/B/A American Spirit Homes vs. Clayton Homes, Inc., CMH Manufacturing, Inc., and CMH Homes, Inc.*; U. S. District Court for the Eastern District of Texas, Texarkana Division (Civil Action No. 598CV365); deposition testimony December 14, 1999; testified as to effects of the reported order backlog on the financial condition, income, market and market share on five of the plaintiff's manufactured home retail locations.

- *Stecher v. Stecher*, Family Court in Dallas County, Texas; deposition testimony December 1, 1999; testified as to the value of a physician's practice (case settled prior to issuance of deposition transcript).

- *Nicole Ameris, et al. vs. Consumer Credit Counseling Services of Greater Dallas, Inc., et al.*; 95th Judicial District of Dallas County, Texas (Cause No. 97-00558-D); deposition testimony October 19, 1999; testified as to anti-competitive practices and anti-trust issues and issues of duties on the part of financial advisors and counselors and fair and adequate disclosure of potential conflicts and sources of remuneration on the part of financial advisors and counselors.

- *Stell v. Stell*; 324th Family Court, Tarrant County, Texas (Cause No. 324-245672-96); trial testimony October 12, 1999; testified as to the value and net tangible asset value of a tattoo business.

- *National Foam Cushion Manufacturing, Inc. v. USF&G Specialty Insurance Co. n/k/a The St. Paul Companies Specialty Insurance Group, et al.*; 38th Judicial District Court of Medina County, Texas, (Cause No. 9803-14365); deposition testimony October 11, 1999; testified as to value of carpet cushion manufacturing operations and impact of financial distress.

- *Joe Long, et al. v. Wells Fargo & Company, et al.*,; U.S. District Court for the Western District of Texas, Austin Division (Civil Action No. A:98CA751-SS); deposition testimony September 11, 1999; testified as to the loss in value in plaintiffs' shares in Wells Fargo as a result of the announcement of the proposed merger between Norwest Corporation and Wells Fargo after plaintiff's agreed to sell their equity in a Texas bank in return for receipt of common shares in Norwest Corporation.

- *Ice Group Addison, Inc. et al. v. C.W. Davis Supply Company, Inc., et al.*; County Court No. 4, Dallas County, Texas (Cause No. 97-7930-D); deposition testimony July 27, 1999; trial testimony October 26, 1999; testimony regarding lost profits suffered by an ice skating rink as a result of allegations of problems with the ice due to improper design or construction.

- *Kenneth O. Hill, et al., v. St. John Knits, Inc., et al.*; Superior Court of the State of California, Orange County Lead Case No. 803090 (Consolidated with Nos. 803085, 803623, 804099, 904387 and 805977); deposition testimony April 19, 1999; testified as to the pricing, terms and fairness of a proposed management buyout of the Defendant corporation.

- *Normandie Metal Fabricators, Inc. v. Commissioner of Internal Revenue;* U.S. Tax Court Docket No. 2526-98; testified in trial March 2 and 3, 1999; testified as to the maximum compensation payable to two officers of a company that specialized in designing and manufacturing fabricated metal and related products primarily for baking and food handling.

- *George J. Cortes, Individually and Derivatively on Behalf of MCS/Texas Direct, Inc., v. John W. Windle, Jr., MCS/Texas Direct, Inc. and Alon R. Stephens, v. George J. Cortes, Individually (Cause No. 352-168681-97),* District Court of Tarrant County, Texas, 352nd Judicial District; deposition testimony February 4, 1999; testimony in hearing on September 10, 1999, and at trial on September 28 and 29, 1999; testified as to the fair market value of a direct mail processing and printing business as of various dates and under various assumptions.

- *Tom Limroth and Jean Limroth vs. Scott Killpack, Latrese Killpack, Plastic Magic, Inc., and Killpack & Limroth Plastics, Inc. d/b/a/ Superior Plastics (Cause No. 352-171839-97),* District Court of Tarrant County, Texas, 352nd Judicial District; deposition testimony November 18, 1998; testimony at hearing December 4, 1998; testified as to the appropriate allocation of expenses between two affiliated companies, the value of each of two companies, reasonable compensation of the officers of those companies and the adequacy of returns to shareholders in a minority shareholder dispute.

- *Stephen Cooper vs. Richard A. Rhodes, As Independent Executor of THE ESTATE OF CHARLES ("SAM") BRAUNAGEL (Cause No. 97-6047-B),* District Court in Dallas County, Texas, 44th Judicial District, testified in deposition on September 8, 1998; testified as to the fair market value and fairness of a negotiated transaction involving the sale of common stock in a private company in December 1992.

- *Jeffrey H. Mims vs. Kennedy Capital Management, et al. (Case No. 97-30566-HCA-7)* United States Bankruptcy Court, Northern District of Texas, Dallas Division, Honorable Judge Harold C. Abramson presiding; testified in deposition on July 16, 1998, trial testimony September 11, 1998; rebuttal to plaintiff's experts on certain valuation, fairness, going concern and damage issues involving an entity that produces nutritional supplements.

- *Bankers Insurance Company v. Department of Insurance (Florida) et al. (Florida Department of Administrative Hearings or DOAH Case Number 96-4938)*: Administrative hearing in the State of Florida; testified in deposition June 26 and at trial June 30 and July 1, 1998; testified as to the arbitrariness and appropriateness of the outcome of a Request For Proposal (RFP) process to select insurance carriers to service the insurance policies issued and underwritten by the Florida Residential Property and Casualty Joint Underwriting Association (FRPCJUA).

- *Derrell Childs vs. Malcolm Brachman, Jane McMakin and Northwest Oil Company, Inc. (Cause No. 97-00677-K);* 192th Judicial District Court, Dallas County, Texas; deposition June 4, 1998; testified as to the lost business income resulting from a personal injury to an accountant.

- *LJ&J Corporation D/B/A Streetz, Foreman Office Products, Inc., Jerry Apodaca, Individually and D/B/A Akard Shoe Repair, Dr. Diane B. Mosbacher and Dr. Matthew Bashoever, Individually and D/B/A/ Accent Optical, Sub Total Sub Shoppe, Inc., and Gifts, Gifts, Gifts v. The City of Dallas v. Gibson & Associates, Inc. (Civil No. #:94-Cv-2420-H);* In the United States District Court for the Northern District of Texas, Dallas Division; trial testimony June 3, 1998; testified in rebuttal to plaintiffs' expert as to the proper measure of damages resulting from the claims of the plaintiffs arising from the repair of Main Street in downtown.

- *Cheryl Worden vs. Dale Bateman, Administrator of the Estate of John Michael Bateman, Deceased; (Cause No. 97-05007);* 353rd Judicial District Court, Travis County, Texas; deposition May 8 and trial testimony May 21, 1998; testified as to the proper measure of damages resulting from the personal injuries suffered by the plaintiff.

- *Hour Messenger Service, Inc. v. Nextel of Texas, Inc. (Cause No. 96-421049);* 190th Judicial District Court, Harris County, Texas; deposition April 6, 1998; testified as to the proper measure of damages resulting from the claims of the plaintiff in operating a courier service.

- *Elenburg, et al. and Willow Creek Dairy v. McAlvain, et al. (Cause No. 9477);* 271st Judicial District Court, Jack County, Texas; deposition February 25, 1998; testified at trial April 27, 1998, as to the value of a large dairy operation.

- *FFP Operating Partners, L.P. d/b/a FFP Partners, Ltd. v. Jarman Services, Ind. D/b/a Jarman Inventory Services (Cause No. 153-162381-96);* Tarrant County, Texas; deposition January 26, 1998; testified as to the losses sustained by FFP due to alleged problems with audits performed by Jarman of FFP convenience stores.

- *Juan Corona and Juana Corona, and Minors v. Aaron Rutledge and Club Hospitality, Inc (Cause No. 96-07166);* 193rd Judicial District, Dallas County, Texas; deposition testimony December 8, 1997; testified as to lost income resulting from an automotive accident.

- *Louise B. Barnes, Donor, v. Commissioner of Internal Revenue;* U.S. Tax Court Docket No. 13850-96; testified in trial in late October 1997; testified in this and related gift tax matters regarding the fair market values of two affiliated local telephone companies and the appropriate basis for evaluating gifts of minority interests in the two subject companies.

- *Reber v. Reber;* Family Court District Number 360, Tarrant County, Texas; testified in December 1997; testified as to the value of a defined pension plan.

- *Exacto Spring Corporation v. Commissioner of Internal Revenue;* U.S. Tax Court Docket No. 27152-96; testified in trial in October 1997; testimony regarding the reasonable compensation of the President and Chief Executive Officer of Exacto Spring.

- *H Group Holding, Inc. and Subsidiaries v. Commissioner of Internal Revenue;* U.S. Tax Court Docket Nos. 6161-91, 2012-92, 7994-93, 2423-95 and 8532-95; conducted interviews under oath of various Hyatt International employees and officers April and May 1997; trial testimony September 1997; testified as to the appropriate allocation of revenues between foreign subsidiaries of Hyatt International and the domestic parent and an affiliated corporation, Hyatt Corporation.

- In Re: *The Harold C. Simmons Family Trust No. 1 and Family Trust No. 2 U/A January 1, 1964;* In the Probate Court of Dallas County, Texas; Deposition testimony two days in September 1997; testimony as the appropriateness of a recapitalization of Contran Corporation and the fair market value of Contran Corporation as of December 31, 1991 and December 31, 1996.

- *Rydex, Ltd.; Michael Ryan; Ryan Industries, Inc.; and Permid, Ltd., Plaintiffs, vs. Norwest Bank Iowa, N.A., Defendant; (Law No. CL000-65483);* In the Iowa District Court for Polk County; Des Moines, Iowa; deposition testimony June 30, 1997; trial testimony December 1997; testified as to the losses sustained by the plaintiffs as a result of the failure of a bank to issue an approved SBA loan.

- *Timberlawn Psychiatric Hospital d/b/a Timberlawn Mental Health Systems v. National Medical Enterprises, Inc., et. al.; (Cause No.94-9969-J);* 191st Judicial District, Dallas County, Texas; deposition testimony April 7, 8 and 9, 1997; trial testimony February 1998; testified as to the losses sustained by Timberlawn as a result of the actions of National Medical Enterprises and its affiliates and addressed issues of market failure in the health services industry, relevant markets for psychiatric hospital services, restraint of trade and attempt to monopolize.

- *Linda Bollen v. Harry A. Spring (Case No. 249-5373-92);* 249th Judicial District, Johnson County, Texas; trial testimony March 20, 1997; testified as to the lost earning capacity and lost earnings of Ms. Bollen due to a personal injury.

- *In the Matter of the Marriage of David E. Webb and Janice H. Webb (Case No. 96-10252-T);* 301st Judicial District (Family Court), Dallas County, Texas; deposition testimony March 14, 1997; testified as to the valuation of the community portion of a retirement plan with both fixed and variable benefit components; reached consensus with the other expert prior to trial.

- *Gellerman Consulting, Inc. vs. Cost Containment Corporation of America, Value Rx Pharmacy Program, Inc., and Value Health, Inc. (Case No. 94-12015-L);* 193rd Judicial District, Dallas County, Texas; deposition testimony November 4, 1996; testified as to the reasonableness of a sales commission agreement and the proper calculation of commissions under the agreement.

- *Douglas W. Fugate, S. Mark Rippley, James Masters, and Cable Advertising Networks vs. Mark Weisbart; Michael Curran; Akin, Gump, Strauss; Hauer & Feld, L.L.P.; Jonathan V. Leaver; and Cable Advertising Concepts. (No. 17-158151-95);* 17th Judicial District, Tarrant County, Texas; deposition testimony September 26 and 27, 1996; additional deposition testimony May 14, 1997; testified as to the value of a cable advertising company.

- *Hodsoll M. Skipper, Jr. v. Daughters of Charity Health Services of Austin d/b/a Seton Medical Center et al. (No. 93-10425);* 250th Judicial District, Travis County, Texas; deposition testimony May 13, 1996; testified as to the present value of a life care plan.

- *John L. Ginger Masonry, Inc. v. Commissioner of Internal Revenue (No. 1695-95);* United States Tax Court, Honorable Judge Clapp presiding; testified April, 1996; prepared a written report and rebuttal report, testified as to the reasonable compensation of the Chief Executive Officer of a concrete and masonry contractor.

- *Panda Energy Corporation v. Heard Energy Corporation, et al. (No. 94-06762-J);* 191st Judicial District, Dallas County, Texas; deposition testimony over three days ending April 15, 1996; testified as to the value of independent power projects outside of the United States.

- *John C. Bieda d/b/a Jack Bieda & Associates, John C. Corbani, and Michael F. Kelly v. J. C. Penney Communications, Inc. and J. C. Penney Corporation, Inc. (92 Civ. 5910);* United States District Court, Southern District of New York; deposition testimony February 21, 1996; testified as to the viability and feasibility of a proposed business venture.

- *Amini-Afshar v. Amini-Afshar,* Family Court, Dallas County, Texas; trial testimony in December 1995; testified as to the value of a defined benefit pension for possible division during divorce.

- *In Re: Thermex Energy Corporation, Debtor (Case No. 390-37987-HCA);* United States Bankruptcy Court, Northern District of Texas, Dallas Division, Honorable Judge Harold C. Abramson presiding; testimony in hearing held November 3, 1995; testified as to the value of ICI Explosives USA in consideration of a proposed settlement between Thermex and Atlas in lieu of the jury's verdict in *Thermex v. Atlas* (cited previously)

- *Joseph Mooibroek v. Orthofix, Inc. f/k/a American Medical Electronics, Inc. et al. (Cause No. 94-4983-C);* 68th Judicial District, Dallas County, Texas; deposition testimony September 26, 1995; trial testimony May 6 and 12, 1997; testified as to the valuation of certain executive stock options and lost earnings as a result of breach of contract, wrongful termination and tortious interference with an employment contract.

- *Norwest Corporation and Subsidiaries v. Commissioner of Internal Revenue (Docket Nos. 20567-93 and 26213-93);* United States Tax Court, Honorable Judge Jacobs presiding; testified September 14, 1995; prepared a written direct report and rebuttal report, testified as to the fair market value of a minority equity investment in a Brazilian pulp and paper manufacturer.

---

- *Dynamic Matrix Control Corporation v. Abdul Majid (Mike) Morshedi, Jeffrey Glen Renfro and Dynamic Optimization Technology Products, Inc. (Cause No. 93-043754);* 270th Judicial District, Harris County, Texas; deposition testimony September 7, 1995; testified as to prospective economic loss suffered by the plaintiff as a result of the use of proprietary software by the defendants.

- *Laidlaw Waste Systems, Inc. vs. Eco Land, Inc. (No. 93-01963-J);* 191st Judicial District, Dallas County, Texas; deposition testimony August 25, 1995; testified as to the economic losses sustained by the defendants as a result of their financial distress.

- *Lawrence W. Kaelin and Adams Industries, Inc. vs. Ebsco Industries, Inc. and David A. Williams (No. 94-03874-D);* 95th Judicial District, Dallas County, Texas; deposition testimony August 19, 1995 and August 30, 1995; testified as to the anti-competitive practices of the defendant in a direct advertising industry.

- *Evelyn T. Smith, Executrix of the Estate of Verna Mae Taylor Crosby, Deceased v. United States of America (No. 1:94CV460RR);* United States District Court for the Southern District of Mississippi, Southern Division; deposition testimony July 28, 1995; trial testimony October 3, 1995; testified as to the valuation of a privately placed promissory note issued by a large public company.

- *Thermex Energy Corporation vs. Atlas Powder Company et al. (No. 92-03-141);* 271st Judicial District, Wise County, Texas; deposition testimony May 4, 1995, trial testimony June 21, 1995; testified as to variable and marginal costs, predatory pricing, the incentives for and feasibility of predatory behavior, the effects and extent of vertical integration, the relevant markets, the effects of concentration on prices and profits, observed price fixing behavior, and observed evidence of market collusion in a highly concentrated industry (the U.S. bulk explosives industry).

- *Todd Matthew Miller et al. vs. Robert Leon Barber et al. (Civil Action No. 4:93 CV 540-Y);* U.S. District Court for the Northern District of Texas, Fort Worth Division; deposition testimony December 2, 1994; testified as the present value of the future income lost by the plaintiff (aged 22) as a result of a personal injury resulting from a motor vehicle accident involving a party alleged to have been under the influence of alcohol.

- *Edward J. Phillips, Inc. vs. Arjo Century, Inc. and James E. Shook  (Cause No. 153-149478-93);* 153rd Judicial District, Tarrant County, Texas; deposition testimony November 9, 1994; testified as to the amount and present value of the lost income suffered by the distributor as a result of the termination of a distribution agreement with the manufacturer.

- *Avis Industrial Corporation vs. Commissioner of Internal Revenue (Docket No. 20575-93);* United States Tax Court, Honorable Judge Cohen presiding; testified October 5, 1994;  prepared a written direct report, testified as to measures of company performance and the reasonable executive compensation of the two principals of a diversified manufacturing company.

- *Salin Bancshares, Inc. vs. United States of America, Department of Treasury (Cause No. S92-00734M);* United States District Court, Northern District of Indiana, South Bend Division; deposition testimony September 23, 1994; testified as to the intangible value of the core deposits of an acquired banking institution and related issues concerning banking and bank acquisitions in the early 1980s.

- *James Masters, et al. vs. Hopkins & Sutter et al. (No. 17-143836-92);* 17th Judicial District, Tarrant County, Texas (separate plaintiffs, different claims & trial from the DeWoody matter listed next); deposition testimony September 19 and 20, 1994, trial testimony February 1995; testified as to the prospective value of two companies which specialized in selling advertising on behalf of local cable television systems.

- *Michael and Paul DeWoody vs. Hopkins & Sutter et al. (No. 17-143836-92);* 17th Judicial District, Tarrant County, Texas; deposition testimony September 19 and 20, 1994, trial testimony November 30,

1994, and December 7, 1994; testified as to the prospective value of two companies which specialized in selling advertising on behalf of local cable television systems.

- *Richard Drummonds vs. Accubank Mortgage Corporation (No. 141-144320-92)*; 141st Judicial Court, Tarrant County, Texas; deposition testimony July 15, 1994, trial testimony August 1 and 2, 1994; testified as to the present value of lost compensation income resulting from the claim of wrongful termination by the plaintiff.

- *Quantum Chemical Corporation vs. The M. W. Kellogg Company (Cause No. 92-45328)*; District Court of Harris County, Texas, 125th Judicial District; confidential deposition testimony June 21, 23, and 24, 1994; nature of testimony is subject to strict confidentiality agreement.

- *Bausch & Lomb, Incorporated and Consolidated Subsidiaries vs. Commissioner of Internal Revenue (Docket No. 13983-91, 1215-91)*; U.S. Tax Court, Honorable Judge C. P. Chiechi presiding; testified December 1993; prepared a written direct report and a written rebuttal report, testified at trial as to the contents of the reports and related matters; testified as to the appropriate measurement of value-added and conversion cost; cost accounting and certain accounting standards, royalties associated with the trade name and transfer pricing issues were subjects addressed at trial.

- *In re: Douglas R. Rekerdres and Gay T. Rekerdres and Rekerdres & Rekerdres Insurance Agency, Inc. (Case No. 390-38517 RCM-7)*; Henry C. Seals, Trustee (Plaintiff) vs. Douglas Randall Rekerdres, Gay Tobin Rekerdres, and Rekerdres Insurance Agency, Inc. (Defendants); U.S. Bankruptcy Court, Northern District of Texas, Dallas Division, Honorable Judge R. C. McGuire presiding; testified at trial on August 31, 1993; testimony regarding the value of an insurance expirations list.

- *Walter Ward Richardson vs. American Airlines, Inc. (No. 153-137437-91)*; District Court of Tarrant County, Texas, 153rd Judicial District; Jury Trial, deposed April 1993 and testified at trial May 1993; testimony regarding the present value of lost wages, lost capacity, and medical expenses incurred by the plaintiff.

- *First Chicago Corporation and Affiliated Corporations vs. Commissioner of Internal Revenue (Docket No. 31175-88)*; U.S. Tax Court; Honorable Judge J. Gerber presiding; prepared written direct testimony and a written rebuttal report, testified February 1993; testimony regarding the intangible value of the core deposits of an acquired financial institution and issues pertaining to that valuation including the amount of equity required.

- *United States of America vs. John W. Brophy (No. CR 3-92-138-D)*; U.S. District Court, Northern District of Texas, Dallas Division; Honorable Judge S. A. Fitzwater presiding; prepared a written direct report, testified February 1993; testimony regarding the valuation of a savings and loan association for purposes of an employee stock ownership plan.

- *James D. Burleson vs. Karen R. Burleson (No. 92-04-35728-CV)*; County of Howard; phone deposition September 1992; testified as to the value of a medical practice and the future earning capacity of a physician.

- *Patricia K. Gray and Patrick C. Gray and in the Interest of Minor Children (No. 91-01-35481)*; 118th Judicial District Court of Texas, County of Howard; video deposition in May/June 1992; prepared a written report and testified as to the value of an automotive body shop.

**XCELERA.COM, INC.**
**EXHIBIT B**
Regression analysis - 02/02/1999 - 12/29/00

## Market & Industry Regressions

| Coefficient | I | | II | | III | | IV | | |
|---|---|---|---|---|---|---|---|---|---|
| Centered R**2 | 14.67% | | 17.49% | | 21.66% | | 28.59% | | Percent of Variance explained by regression |
| SEE | 10.32% | | 15.78% | | 19.18% | | 23.64% | | Standard error of residual (portion of movement unexplained by regression) |
| Constant | 0.87% | 1.67 | 1.92% | 1.86 | 3.08% | 2.05 | 5.38% | 2.33 | |
| CCMP | 62.85% | 2.13 | 29.63% | 0.74 | 15.97% | 0.38 | 16.96% | 0.37 | NASDAQ Composite stock index |
| SUBINDX1 | 68.37% | 2.93 | 98.04% | 3.28 | 118.52% | 3.70 | 131.39% | 4.16 | Equal weight geometric index consisting of INKT, CITN, CMGI, SFE, AOL, ELNK, YHOO, INTA |

## Market, Event and Industry Regressions

| Coefficient | I | | II | | III | | IV | | |
|---|---|---|---|---|---|---|---|---|---|
| Centered R**2 | 67.45% | | 69.63% | | 73.76% | | 80.14% | | Percent of Variance explained by regression |
| SEE | 6.37% | | 9.57% | | 11.10% | | 12.47% | | Standard error of residual (portion of movement unexplained by regression) |
| Constant | -0.37% | -1.22 | -0.44% | (0.80) | -0.56% | (0.70) | -0.19% | (0.15) | |
| CCMP | 82.17% | 4.99 | 58.90% | 2.41 | 45.25% | 1.72 | 20.74% | 0.70 | NASDAQ Composite stock index |
| SUBINDX1 | 33.15% | 2.87 | 50.60% | 3.94 | 67.10% | 4.80 | 83.36% | 5.92 | Equal weight geometric index consisting of INKT, CITN, CMGI, SFE, AOL, ELNK, YHOO, INTA |

| # | Date | I | t | II | III | IV | Event |
|---|---|---|---|---|---|---|---|
| 1 | 04/01/1999 | 194.76% | 30.56 | 278.56% | 278.97% | 268.18% | Scandinavia Co buys majority stake in Internet Company, Mirror Image Internet Inc. |
| 2 | 04/05/1999 | 56.01% | 8.79 | | | | Scandinavia Co. rises for 2nd straight day after announcing entry into Internet software |
| 3 | 04/06/1999 | -24.65% | -3.87 | | | | Scandinavia Co. declines after massive rise |
| 4 | 04/09/1999 | 27.05% | 4.24 | 5.91% | 9.93% | 10.59% | "Wall Street Interviews" issues replay of Scandinavia Co. "interview" |
| 5 | 04/12/1999 | 29.53% | 4.63 | 54.70% | 46.55% | 34.46% | Scandinavia Co. announces bundled caching solution with Entera |
| 6 | 04/13/1999 | 23.04% | 3.61 | | | | Scandinavia Co. rise for second day on new regarding bundled caching solution with Entera |
| 7 | 04/15/1999 | | | | | | Scandinavia Co. details joint-caching partnership |
| 8 | 04/19/1999 | -19.98% | -3.13 | -16.65% | -13.28% | -13.60% | Yahoo: Internet stocks dive |
| 9 | 08/25/1999 | 20.86% | 3.27 | 29.45% | 33.33% | 46.00% | Co. announces one of world's largest Oracle-R Internet Infrastructure Database Implementations |
| 11 | 09/29/1999 | 24.33% | 3.82 | 27.94% | 27.97% | 28.57% | Co. deploys sun enterprise servers in London and Frankfurt |
| 12 | 09/30/1999 | 23.60% | 3.70 | 15.44% | 14.01% | 12.97% | Co. announces 2 for 1 stock split |
| 13 | 10/14/1999 | 31.79% | 4.99 | 34.01% | 35.35% | 44.04% | Leakage: Co. announces Microsoft agreement following day |

| # | Date | | | | | | Description |
|---|------|------|-------|---------|---------|---------|-------------|
| 14 | 10/25/1999 | 25.29% | 3.97 | 25.63% | 25.78% | 30.92% | Scandinavia Co. changes name to Xcelera. Scandinavia Co.'s shares advanced sharply Monday, reaching a 52-week high, and Chief Executive Alex Vik attributed much of the jump to the company's agreement to use Inktomi Corp.'s software in its Internet services; 2 for 1 stock split |
| 15 | 11/01/1999 | 37.26% | 5.85 | 39.62% | 37.41% | 29.60% | Xcelera's unit Mirror Image Internet said it will expands its worldwide network. |
| 16 | 11/09/1999 | 22.91% | -3.60 | -39.77% | -43.62% | -49.44% | Yahoo: Lucent announces apparent intention to compete in similar technology |
| 17 | 11/10/1999 | 24.31% | -3.81 | | | | Stock falls for third day on Lucent intentions |
| 18 | 11/11/1999 | 37.18% | 5.83 | 15.47% | 20.07% | 19.79% | Xcelera declares that there has been no material development in the company to cause the volatility. Gets $10 million investment from majority holder VBI HP to take $32 million stake in Xcelera. EquityAlert.com Announces Investment Opinion, No. 1 of 4 |
| 21 | 12/21/1999 | 21.04% | 3.30 | 52.82% | 64.17% | | Co. rise for 2nd day after Hewlett Packard invests $32MM |
| 22 | 12/22/1999 | 53.23% | 8.35 | | | | Xcelera names Santullo unit president, ceo. |
| 23 | 12/23/1999 | 20.85% | 3.27 | 45.41% | 31.47% | 25.93% | Big Blue pumps big bucks into e-commerce |
| 25 | 01/19/2000 | 16.85% | 2.64 | 11.59% | 4.19% | 1.30% | Xcelera units joins Metromedia Unit Exchange. |
| 26 | 01/20/2000 | 22.33% | 3.50 | 27.78% | 39.11% | 42.38% | Xcelera announces stock split. |
| 27 | 01/25/2000 | 24.08% | 3.78 | 32.47% | 35.61% | 25.91% | Xcelera jumps on comments in Gilder Technology Report. |
| 29 | 02/17/2000 | 43.23% | 6.78 | 62.61% | 75.17% | 76.47% | Stock rise for 2nd day in response to Gilder report recommendation |
| 30 | 02/18/2000 | 31.57% | 4.95 | | | | Xcelera.com has signed an agreement with Hewlett-Packard that will allow faster and more reliable delivery of Internet content |
| 31 | 02/25/2000 | 12.65% | 1.98 | 11.94% | 3.00% | 31.26% | Xcelera.com Inc. (XLA) shareholder VBI Corp. registered to sell 500,000 shares of the company's common stock, valued at approximately $131 million.  SQUAWK BOX - XCELERA.COM - CEO - Interview |
| 32 | 02/28/2000 | 24.13% | 3.79 | 20.99% | 25.36% | -2.20% | Exodus to invest $637.5 million in Xcelera.com's mirror image. |
| 34 | 03/22/2000 | 24.44% | 3.84 | 23.51% | 26.16% | 24.69% | VBI files Form 144 announcing sale of 500,000 between 2/22/00 and 3/9/00; Bloomberg |
| 35 | 04/03/2000 | 17.18% | -2.70 | -25.04% | -28.48% | -31.08% | Mirror Image Internet Expands Global CAP Content Delivery Network. Xcelera.com Holder Registers To Sell 100,000 Cmn Shares |
| 36 | 04/05/2000 | 25.69% | 4.03 | 25.73% | 35.77% | 45.65% | VBI files Form 144 announcing sale of 100,000 between 2/22/00 and 3/23/00; Bloomberg : At shareholder meeting Board Okays authorized shares to 400 million and declares 2 for 1 stock split. |
| 37 | 04/10/2000 | 11.12% | -1.74 | -11.35% | -6.22% | -14.12% | Survey Says: 78% of U.S. Internet Population to Use Wireless Data Applications By 2001. |
| 39 | 04/17/2000 | 15.16% | -2.38 | -22.25% | -24.99% | -24.90% | Internet stocks soar... |
| 42 | 06/02/2000 | 11.82% | 1.85 | 19.78% | 23.13% | 27.08% | Lazard Freres initiated coverage with an underperform rating, target price $7. |
| 43 | 07/13/2000 | 19.78% | -3.10 | -14.70% | -16.79% | -19.83% | Declares net income for fiscal year ending Jan ,2000. Mentioned it will withdraw a form 144 filed earlier, and reiterates FPHC status |
| 46 | 07/31/2000 | 10.43% | -1.64 | -7.15% | -10.34% | -25.92% | Marc Lichtenfeld of Lazard Freres identifies several problems that Xcelera investors should be aware of, including taxability issue |
| 47 | 08/01/2000 | 4.99% | 0.78 | -3.86% | -7.12% | 1.08% | |
| 48 | 08/07/2000 | 12.30% | 1.93 | 12.04% | 7.67% | -2.97% | Mirror Image Internet hires two communication firms to build brand identity. |
| 49 | 08/09/2000 | 14.76% | -2.32 | -14.01% | -10.33% | -5.71% | Bloomberg News reports Xcelera may have to hand over $622MM in stock |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 50 | 08/11/2000 | 15.29% | 2.40 | 13.00% | 8.24% | 6.38% | Xcelera may issue special dividend to cover tax concerns. Kirby McInerney & Squire, LLP Commences Class Action Lawsuit Against Xcelera.com, Inc. |
| 51 | 08/21/2000 | 23.62% | 3.71 | 27.72% | 23.83% | 25.50% | |
| 52 | 08/22/2000 | 21.04% | 3.30 | 14.15% | 18.37% | 23.95% | Gilder Technology report issued highlighting XLA's successful funding of MII Robert V. Green, Technology Analyst at Briefing.com, and ON24's Cheryl Casone answer an audience question about Xcelera.com; Berger & Montague files class action |
| 53 | 08/23/2000 | -19.05% | -2.99 | -14.72% | -16.57% | -22.47% | XLA announces Content Bridge alliance with Adero, AOL, Digital Island, Exodus, Genuity, Inktomi, and NetRail |
| 54 | 09/05/2000 | 23.12% | 3.63 | 29.92% | 37.72% | 46.90% | Gilder Technology report issued discussing MII's successful work with Firestone website |
| 55 | 09/12/2000 | -17.32% | -2.72 | -16.56% | -16.14% | -10.92% | Hundreds of Xcelera Shareholders Seek Information On Class Action Accusing Company Of Fraud, Says Berman DeValerio & Pease |
| 56 | 11/29/2000 | -14.12% | -2.22 | -18.58% | -15.68% | -17.21% | Co. files 8-K further revealing extent of potential dilution |
| 57 | 12/01/2000 | 24.18% | 3.79 | 15.74% | 13.49% | 12.94% | Leakage. Xcelera reiterates plan to declare special dividend. Announces results of annual meeting of stockholders. |